**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| ASSOCIATION FOR EDUCATION FAIRNESS, | * | |
| Plaintiff, | * | |
| v. | * | Civ. No. 8:20-02540-PX |
| MONTGOMERY COUNTY BOARD OF EDUCATION, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | *** | |

## <u>MEMORANDUM OPINION</u>

This case concerns the constitutionality of recent changes by Defendants Montgomery County Board of Education ("Board" or "Board of Education") and Superintendent Jack Smith ("Smith") to the admissions process for the County's magnet middle school programs. Plaintiff Association for Education Fairness ("AFEF" or "Plaintiff") brings this action on behalf of its organization's members, including parents with Asian American children attending the County's elementary and middle schools. ECF No. 1 ¶¶ 3, 9, 11. AFEF specifically challenges the selection criteria for the County's middle school magnet programs as purposely designed to decrease the proportion of Asian American students so as to achieve racial and socioeconomic diversity. *Id.* ¶¶ 88–89. Defendants (also collectively referred to as "the County") now move to dismiss the Complaint on several grounds. The motions have been fully briefed, and a hearing was conducted on September 1, 2021. *See* Loc. R. 105.6. For the following reasons, the Court DENIES the motions. ECF Nos. 21 & 27.

I.      **Background**

      A.      **History and Structure of Montgomery County Public Schools**

By statute, the Montgomery County Public Schools ("MCPS") operates through the Board of Education, which is vested with the authority to maintain "a reasonably uniform system of public schools that is designed to provide quality education and equal educational opportunity for all children."  Md. Code Ann., Educ. § 4-108(2) (West 1996); *see also id.* § 4-101.  The Board of Education, in turn, selects the MCPS Superintendent, who acts as the chief administrator of the school system and sets districtwide policy for most aspects of MCPS' operations.  *See id.* §§ 4-102, 4-103, 4-108, 4-109, 4-111, 4-201, 6-201.  As the Board's "executive officer," *id.* § 4-102, the Superintendent advises the Board on the "educational policies of the county school system," *id.* § 4-108(3).  The Superintendent serves for four-year terms subject to the Board's reappointment.  *Id.* §§ 4-201(b), (e).

In 2015, the Board commissioned Metis Associates, Inc. to conduct an in-depth study of whether its choice and special academic programs align with MCPS' core values of academic excellence and equitable access to education.  ECF No. 1 ¶¶ 28–29, 35.  A year later, Metis published an impressive, well documented compendium chronicling the history of MCPS and the programming at the heart of this case (hereinafter the "Metis Report" and cited as "MR").  *Id.* ¶¶ 15 n.3, 29–30.  The Court thus relies on the Metis Report to set forth the historical facts pertinent to this matter.[1]

As the Report details, MCPS represents one of the largest and most racially, culturally, and socio-economically diverse public school systems in the United States.  MR at 5.  MCPS

---

[1] The Metis Report is expressly incorporated by reference into the Complaint, and the County does not question its accuracy or authenticity.  *See* ECF No. 1 ¶ 15 n.3.  The Court accepts the Metis Report as part of the Complaint facts and construes it most favorably to AFEF.  *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

operates 208 public schools serving 165,267 students who hail from over 100 different countries and speak collectively over 100 different languages.  ECF No. 1 ¶ 12; MR at 15.  Its students live in rural, urban, and suburban communities across the County's approximately 500 square miles, with pockets of affluence and of poverty.  MR at 15.

MCPS has a "long history of offering a variety of choice and other special academic programs designed to provide students with opportunities to receive specialized instruction in schools outside of their local attendance boundaries."  *Id.* at 5.  These programs include language immersion curricula, elementary centers for "highly gifted" students, regional consortia offering thematic instructional options, and academically selective magnet programs at the middle and high school level.  *Id.*  This dispute involves solely the middle school magnet programs with selective admissions criteria.  Currently, there are four: two located in the "Upcounty" region—a science and technology ("STEM") program at Roberto Clemente Middle School ("Clemente") and a humanities program at the Martin Luther King Jr. Middle School ("MLK"); and two in the "Downcounty" region—a STEM program at Takoma Park Middle School ("Takoma Park") and a humanities and communications program at Eastern Middle School ("Eastern").  ECF No. 1 ¶¶ 20–21.  Students who reside in the Upcounty region apply to the Clemente and MLK programs, while Downcounty students apply to Takoma Park and Eastern.  MR at 96.

MCPS' magnet programs were originally developed "to serve the dual purpose of promoting diverse student enrollment and academic excellence."  *Id.* at 94.  The middle school magnet programs have "utilized selective admissions criteria to identify students to participate in the[ir] rigorous instruction programs."  *Id.* at 33.  MCPS takes pride in the "unique educational experiences" these programs provide to "highly able students," which "are not offered through

honors or Advanced Placement in home schools."[2]  *Id.* at 94; ECF No. 1 ¶ 23.  Not surprisingly, each of the four middle school magnet programs are in great demand.[3]

The genesis of the middle school magnet programs, and indeed the choice-based programs at MCPS more generally, remain inextricably intertwined with the County's efforts at achieving and maintaining racial integration throughout its school system.  MR at 29.  In the wake of *Brown v. Board of Education*, 347 U.S. 483 (1954), MCPS was never subject to court-ordered desegregation.  ECF No. 1 ¶ 15.  Rather, it voluntarily desegregated the schools and thereafter made "a strong commitment to integrated education."  MR at 29.

In the 1970s, amid growing concerns of "racial isolation," MCPS established magnet programs as part of its "first integration efforts."  *Id.* at 30.  At the time, minority students comprised about 11% of the student body.  *Id.*  Like the name suggests, "magnet" programs were designed to offer "innovative instruction, stabilize enrollment, and decrease segregation by attracting and retaining White students to schools . . . where the Black/African-American population was increasing significantly."  *Id.* at 31; ECF No. 1 ¶ 16.  The "magnet schools" thus offered programs of choice aimed at fostering racial diversity throughout the district.  *Eisenberg ex rel. Eisenberg v. Montgomery Cnty. Pub. Schs.*, 197 F.3d 123, 125 (4th Cir. 1999).

In the 1980s, the percentage of minority students attending MCPS nearly doubled.  MR at 30.  MCPS, in response, expanded its magnet programs to "support its voluntary desegregation efforts."  *Id.* at 32.  MCPS recognized that as its population grew, "racial isolation continued to increase in certain areas of MCPS."  *Id.*  To counteract this trend, MCPS created additional elementary magnet school programs and next, middle and high school magnet programs with

---

[2] "Home school" refers to the local school assigned to a student by area of residence.

[3] In 2016, the Metis Report noted that in 2013-2014, only 26% of all applicants were invited to attend one of the middle school magnet programs.  MR at 13.

selective admissions criteria.  *Id.* at 33.

In the 1990s, "MCPS faced new challenges in providing quality integrated education." *Id.* at 35.  Concerned that "overall achievement levels . . . masked low achievement among ethnic minority groups," MCPS commissioned a study aimed at "improving minority student outcomes." *Id.*  The results of the study confirmed MCPS' fears. *Id.*  Particularly with regard to the magnet programs, the study concluded that while those programs were "created to serve the purpose of reducing racial isolation in schools," they had not adequately served the "academic development interests of minority students." *Id.*

From this, and after much consideration, MCPS renewed its focus on mitigating racial segregation within the magnet schools. *Id.*  In 1993, MCPS adopted a formula to calculate the "diversity profile" of every school, looking to each school's racial composition and the "rate of change" in that composition over a four-year period. *Id.* at 36.  MCPS also incorporated into its "diversity profile" economic need as captured by a student's eligibility for free and reduced-priced meals ("FARMS") and other metrics. *Id.*  To further promote integration, MCPS also altered its inter-school transfer policy to consider these "diversity profiles" when either granting or denying a transfer request. *Id.*; *see also Eisenberg*, 197 F.3d at 126–27.  Where granting a transfer would have a negative "impact on diversity" at either the home or transfer school, the request was denied. *Eisenberg*, 197 F.3d at 127.

And yet, despite MCPS' efforts to maintain racial integration in its schools, MCPS was criticized on all fronts.  Some educators accused MCPS of creating "within-school segregation" in its magnet programs because they "ha[d] not systematically broken up pockets of segregation and concentrated poverty."  MR at 37 n.33 (quoting Susan Eaton & Elizabeth Crutcher, *Slipping Towards Segregation: Local Control and Eroding Desegregation in Montgomery County*

(1994)).  Meanwhile, other parents and organizations filed suit, challenging the district's race-conscious transfer policy.  *Id.* at 37.

One such challenge came to a head in *Eisenberg.*  There, the parents of a white student sued MCPS for denying their child's transfer request on the basis of his race.  197 F.3d at 127–28.  In reversing the district court, the Fourth Circuit concluded that even though MCPS' transfer policy was aimed at attracting students of "all . . . backgrounds to be part of a different learning environment," the policy denied the white student equal protection under the law.  *Id.* at 131–33.  The Court more particularly concluded that the policy had not been "narrowly tailored to the interest of obtaining diversity," but instead was aimed at "keeping certain percentages of racial/ethnic groups within each school" by way of impermissible "nonremedial racial balancing."  *Id.* at 131 (quotation omitted).[4]  After the *Eisenberg* decision, the Board suspended its transfer policy.  MR at 38.

By the early 2000s, now in the fourth decade of its efforts, MCPS once again faced the criticism that its choice programs failed to maintain racial diversity.  *Id.* at 44.  This time, the critics took aim at the academically selective magnet programs.  In 2005, the organization African-American Parents of Magnet School Applicants reported on three years of admissions data, which demonstrated the lack of racial and ethnic diversity in the programs.  *Id.* at 44–45; ECF No. 1 ¶ 24.  MCPS, in response, "recognized the need to increase the number of non-White students applying to the programs."  MR at 45.  To achieve this end, MCPS initiated parent

---

[4] The *Eisenberg* Court also assumed that fostering "racial diversity" represented a compelling government interest without defining what "diversity" meant in the secondary school context.  197 F.3d at 130 ("We will assume, without holding, . . . that diversity may be a compelling government interest and proceed to examine whether the transfer policy is narrowly tailored to achieve diversity," but "no inference may here be taken that we are of [the] opinion that racial diversity is a compelling government interest." (citation omitted)).  "Diversity" instead appeared to be used in *Eisenberg* interchangeably with "racial balancing" and "avoidance of racial isolation."  *Id.* 130–31.  As discussed *infra,* it remains to be seen whether MCPS' current concept of "diversity" amounts to more than "mere racial balancing."  *Id.* at 131.

workshops to increase awareness of the programs, expanded student practice sessions for the magnet entrance exams, and provided transportation on test day.[5]  *Id*.

In the last decade, the racial composition of the MCPS student body has shifted once again.  As of 2010-2011, MCPS considered itself "majority minority" with 37.2% of the student body identifying as white, and the remaining population identifying as 23.4% Black, 23.4% Hispanic, and 15.7% Asian American.  ECF No. 1 ¶ 19.   Notably, the magnet middle schools did not align with these racial demographics.  For example, in the 2013-2014 school year, Asian American students comprised only 14.8% of the overall MCPS student body, yet occupied nearly half of the magnet school seats (45.5%).  *Id*. ¶ 25.  By contrast, Hispanic and Black students comprised nearly half of the total student body (26% and 21.4%), but in the middle school magnet programs, occupied only 7.9% and 5.6% of the seats respectively.  *Id*.

In June 2013, the Board of Education approved a new Strategic Planning Framework reaffirming its commitment to "educating each and every student so that academic success is not predictable by race, ethnicity, or socioeconomic status."  *Id*. ¶ 27; MR at 15–16.  Accordingly, MCPS declared that "equity" includes a searching inquiry as to whether all students, regardless of race, gender, or socioeconomic status, can access MCPS' programming, in light of the "continuing growth of MCPS student enrollment and the changing demographics of the region, both countywide and at the neighborhood level."  MR at 16.  The Board also resolved to "initiate a comprehensive study" of all choice and special academic programs to explore whether they align with MCPS' "core value of equity."  *Id.*; ECF No. 1 ¶ 28.  From this, the Metis Report issued in March 2016.  ECF No. 1 ¶ 30.

---

[5] The Metis Report did not review the efficacy of these specific initiatives.  *See* MR at 45.

## B.      Metis Report Recommendations and MCPS' Response

Although the Metis Report surveyed all choice and special academic programs, the findings and recommendations most relevant to this matter concern those related to the middle school magnet programs.  In these programs, the Metis Report found that "significant racial and socioeconomic disparities" exist in enrollment and acceptance rates.  *Id.*  These disparities "suggest a need to revise the criteria and process used to select students for these programs to eliminate barriers to access for highly able students of all backgrounds."  *Id.* (quoting MR at 9).  To support this finding, the Metis Report expressly identified Hispanic, Black, limited English proficient, special education, and FARMS students as "underrepresented" groups in these programs when compared to districtwide enrollment data.  MR at 9–10; ECF No. 1 ¶ 30.  The Report hypothesized that "the lack of diversity and underrepresentation of some student subgroups in these programs suggests that the process may rely too heavily on one or more indicators or may need to consider additional measures of student ability."  MR at 10.

Based on this finding, the Report issued one recommendation central to this suit:

> **Recommendation 3a:** Implement modifications to the selection process used for academically competitive programs in MCPS, comprising elementary centers for highly gifted students and secondary magnet programs, to focus these programs on selecting equitably from among those applicants that demonstrate a capacity to thrive in the program, that include use of non-cognitive criteria, group-specific norms that benchmark student performance against school peers with comparable backgrounds, and/or a process that offers automatic admissions to the programs for students in the top 5-10% of sending elementary or middle schools in the district.

*Id.*; ECF No. 1 ¶ 31.

Metis presented the Report to the Board of Education on March 8, 2016.  ECF No. 1 ¶ 35.  Thereafter, the Board placed Smith and MCPS in charge of "addressing Metis' key recommendation."  *Id.*  To best ascertain how to do so, MCPS began engaging the community in

dialogue as to the "findings, the recommendations, and a collective vision of choice within MCPS predicated on equity of access and excellence in teaching and learning." *Id.*

This dialogue became a hotbed of controversy. Within weeks, the Washington Post published that the Metis Report had identified "marked disparities by race and ethnicity in enrollment and acceptance rates" in MCPS' selective academic programs. *Id.* ¶ 36 n.6. In the same article, Board of Education member Patricia O'Neill ("O'Neill") commented that "we seriously need to step up to the plate and tackle this issue," noting that the Board is "not doing a very good job of bringing in African American and Latino students." [6] *Id.*

Shortly after, on April 6, 2016, MCPS officials conducted the first of three community meetings regarding the Metis Report findings. *Id.* ¶¶ 37–38. At these meetings, MCPS discussed the possibility of using "non-cognitive criteria" in the admissions process to achieve more "equitable" magnet programs. *Id.* In response, parents of Asian American students voiced their opposition to the Report, fearing its recommendations would disproportionately impact their children. *Id.*

The two subsequent meetings generated intense interest, with more than 800 community members in attendance to discuss the implications of the Metis Report on future special academic programs. *Id.* ¶ 38. On May 10, 2016, parents of Asian American students again vigorously opposed Recommendation 3a at a Board of Education meeting. *Id.* ¶ 39. They urged MCPS to focus instead on early talent development, strengthening local schools, and building a "pipeline" to their academically selective programs, rather than creating "different" or "lower"

---

[6] O'Neill expressed similar sentiments in the February 2017 report published by the National Coalition on School Diversity. ECF No. 1 ¶ 44. O'Neill commented that MCPS "has changed over the many years that these programs have been in existence and they should be reflective of our community, our diverse community" and expressed hope that in the future, such "programs will become more diverse and be more reflective of our student population and continue the success that our students have had in the programs." *Id.*

standards in the magnet middle schools.  *Id.* ¶ 39 n.8.  Responding to these concerns, Board member Jill Ortman-Fouse ("Ortman-Fouse") rejected the implication that MCPS would "be lowering [its] standards  . . . for other races."  *Id.*  She told one Asian American parent: "Your pursuit of the American Dream is not necessarily everyone's pursuit of the American Dream. And in our country, we have experienced decades of horrors and atrocities against our African American families.  And that population has worked just as hard."  *Id.*  Board member Judith Docca ("Docca") also praised Ortman-Fouse for addressing the difficult subject of racial representation in MCPS' selective programs, adding that "it looks like it's because they are Latino or African American because they are not in the programs unless we're saying they are just not as intelligent."  *Id.* ¶ 39.  Notably, Docca punctuated these comments with a call to action: "We need to do something about why some of our kids are not getting into the program when we know that they are bright."  *Id.*

A few weeks later, the Washington Post captured the controversy surrounding the Metis Report in an article titled "*Report on Racial Disparities in Gifted and Magnet Programs Gets Strong Reaction*."  *Id.* ¶ 40 n.9.  The article highlighted the concerns voiced by parents of Asian American students about the use of "group specific norms" to address racial disparities.  *Id.*  The article next broke down the controversy in numbers: "Asian students account for 14.2 percent of the 156,000-student district's enrollment, but represent a larger share of students in many selective programs."  *Id.*  In the district's highly gifted elementary programs, "enrollment was 47 percent white, 34 percent Asian, 8 percent African American and 4 percent Hispanic in the 2013-2014 school year."  *Id.*  The article concluded with the observations of one attendee, who described the community meetings as "very intense and emotional," noting that "the parents who react strongly to this feel their kids are being seen as members of racial groups instead of

individuals with needs."  *Id.*

At the next meeting held on July 12, 2016, several Board members committed their floor time to discussing the magnet programs.  *Id.* ¶ 41 n.10.  Board member Docca focused on the underrepresentation of certain groups in one of the high school magnets:

> When we look at the population of our students, we shouldn't have 43% of one group in academically excellent courses or challenging courses or IB, and I think it is 23% of another group.  And then you have 23% African American and 27% Latino, and the African Americans comprise about 4% of these challenging courses, and Latinos about 3 or 4% also.  We just can't let this happen.

*Id* ¶ 41.  Similarly, at the next Board meeting on October 24, 2016, Board member Christopher Barclay ("Barclay") urged MCPS to do more than simply adopt a "blind and neutral" process.  *Id.* ¶ 43.  Barclay advocated for "controls" so that these programs "reflect the community that we live in, and . . . address some of the disparities that exist."  *Id.*

### C.   Changes to Magnet Middle School Admissions and the Field Test

Alongside the community meetings, the Board "charged" Smith and other MCPS officials "with addressing Metis' key recommendation."  *Id.* ¶ 42 n.12.  By September 2016, Smith reported that after "[d]istilling the findings, recommendations, and stakeholder input," MCPS had "developed a timeline for addressing the myriad of programs, policies, and structures identified by Metis' findings."  *Id.*  MCPS rolled out changes to the admissions process for the elementary magnet programs during the 2016-2017 school year and for the middle school magnet programs the next year.  *Id.* ¶ 45 n.15.  Because the changes to the middle school magnet programs are central to this matter, the Court describes the admissions process before and after the Metis Report.

Before the Metis Report, the admission process began with the parents of fifth-grade students submitting an application for consideration.  *Id.* ¶ 47.  Because the onus was on the

parents to initiate the process, only 700 to 800 out of 8,000 students in the Downcounty region applied each year to the Takoma Park and Eastern magnet programs.  *Id.*  Every applicant next had to sit for the Cognitive Abilities Test ("CogAT"), a standardized aptitude test designed to measure quantitative, verbal, and nonverbal skills.  *Id.* ¶¶ 47, 62 n.38.  Based on the CogAT scores, as well as performance on state assessments, grades, and teacher recommendations, MCPS would invite the top performing students to participate in the magnet programs.  *Id.* ¶ 47.

The admissions process after the Metis Report, known as the "field test," was implemented over two school years.  MCPS first administered the field test to select students for the Downcounty programs at Takoma Park and Eastern, for the 2018-2019 school year.  *Id.* ¶ 46.  This field test made several noteworthy changes.  First, it universally screened every MCPS student, abandoning the previous parent-initiated model.  *Id.* ¶ 48.  MCPS looked at every fifth-grade student in the Downcounty zone (roughly 8,164) and, based on their grades and test scores, invited roughly half of them to sit for the CogAT exam.  *Id.* ¶ 48 n.19.

Second, in reviewing each child's record, the field test removed "overreliance" on teacher recommendations, which MCPS found as potentially "infected with racial bias."  *Id.* ¶ 49.  Third, in deciding which students to invite to the program, MCPS considered whether a given applicant would have an academic "peer group" at his or her local middle school.  *Id.* ¶ 50.  MCPS has not explained how it identifies a "peer group," except to describe it as a "cohort of 20 or more students in the same middle school with comparable academic range."  *Id.*  Under this "peer group" rule, however, "students who are high performing may or may not be invited to the program based on the availability of a peer group at their middle school."  *Id.*

These changes meaningfully altered the racial composition of the Downcounty magnet programs.  For the 2018-2019 school year as to Takoma Park, Asian American applicants

received 31.4% of the invitations as compared to 39.3% the year before.  *Id.* ¶ 52; ECF No. 1-2 at 2.  Similarly, at Eastern, Asian American student invites dropped to 18.3% from 26.4%.  ECF No. 1 ¶ 53; ECF No. 1-2 at 3.  By comparison, Black students experienced the greatest percentage gain at Takoma Park, securing 13.9% of the total seats compared to 7.4% the previous year; the Hispanic student population increased most at Eastern, from 7% in 2017 to 16.2% during the field test.  ECF No. 1 ¶¶ 52–53; ECF No. 1-3 at 10–11; ECF No. 1-4 at 10, 12.  Further, at the Upcounty magnet schools, which were not yet part of the field test, the proportion of Asian American students at Clemente and MLK actually increased from 61.7% to 64% and from 53.8% to 58.9% respectively.  ECF No. 1 ¶ 55.

Plaintiff alleges the "peer group" rule caused the precipitous decline in the number of Asian American students admitted to the Downcounty magnet programs.  *Id.* ¶¶ 51, 63.  According to Plaintiff, Asian American students are clustered in about 25 of MCPS' 135 elementary schools; and so with this rule, MCPS can disproportionately reject Asian Americans from the magnet programs because the Asian American students are more likely have a "highly able" cohort at their local middle schools.  *Id.*  To illustrate this point, Plaintiff notes that several Asian American students who had scored in the 95th percentile on the CogAT and had received top scores on other state assessments were nonetheless rejected from the programs for the 2018-2019 school year.  *Id.* ¶ 64.  Also, at Cold Spring Elementary School alone, roughly a dozen Asian American students who had scored in the 99th percentile on the CogAT were denied admission.  *Id.* ¶¶ 56, 63–64.

On April 24, 2018, Superintendent Smith shared the field test results with the Board.  *Id.* ¶ 47 n.18.  Smith emphasized the sharp increase in the number of students considered through the "universal screening" method.  *Id.*  He also noted an increase in the number of Hispanic and

FARMS students admitted, as well as a "slight increase for Black or African American students." *Id.*  Lastly, Smith highlighted for the Board that unlike past years where students from just "a few elementary schools dominated the admission process," the "vast majority" of MCPS' 80 elementary schools had students admitted during the field test.  *Id.*

MCPS also presented these results and discussed next steps at a Board of Education meeting that evening.  *Id.* ¶¶ 57–58.  The Board's response is noteworthy.  MCPS officials celebrated a steep rise in the admission rate for FARMS students, and praised MCPS for identifying 20 additional middle schools with "highly able" cohorts for which MCPS planned to provide enriched programming for those students at their home schools.  *Id.* ¶ 57 n.33.  But discussion also turned to the impact the field test had on altering the racial composition of the incoming magnet middle school classes.

Board member Docca asked why there was only a "slight" increase in the percentage of Black students invited as compared to the prior year.  *Id.* ¶ 57.  Jeannie Franklin ("Franklin"), MCPS' Director of Consortia Choice and Application Program Services, echoed that she too had expected a larger increase because the pool of students considered had grown significantly.  *Id.*  One member also asked Smith if any "legal barriers" existed to "implementing some form of affirmative action, either socio-economic or racially," and inquired, "Why don't we do something like that?"  *Id.* ¶ 58.  Smith responded that MCPS could not consider race but could consider poverty when implementing changes to the admissions process.  *Id.*

The Board held two more meetings in May 2018 to discuss the field test results.  *Id.* ¶¶ 59–60.  Asian American parents reiterated their concern that children with test scores in the 99th percentile were rejected from the magnet programs.  *Id.*   As a counterweight, Board member Barclay noted that "MCPS was systematically under-educating Black and Brown children."  *Id.* ¶

60 n.36.  Although he praised Smith for "re-introducing and implementing a system that uses student achievement data more clearly and effectively," Barclay stressed that "[r]hetorical support for progress not matched with effective policies and structures to dismantle the barriers and rapidly improve the material impact of said barriers is an old tool in the cynical American political playbook."  *Id.*

### D.       Expansion and Refinement of the Field Test

For the 2019-2020 school year, MCPS expanded the field test to the Upcounty magnet programs.  *Id.* ¶ 65.  In addition to the previous admissions changes, MCPS also decided to "locally norm" students' CogAT scores as follows:  First, MCPS designated each elementary school as either a low-poverty, moderate-poverty, or high-poverty school based on the family income level of its students.  Next, MCPS normed each student's CogAT score so that students were only compared to others from elementary schools in the same poverty band.  *Id.* ¶ 66. Asian American students, who are clustered in low-poverty schools, were markedly affected by this change.  *Id.*  Because while Asian American students generally earned high scores on the CogAT, they fared less well when only compared to other test-takers from low-poverty schools. *Id.*  By contrast, white students, who are spread more evenly across the three bands, and Black and Hispanic students, who tended to concentrate in mid- to high-poverty schools, gained greater representation in the magnet programs after local norming.[7]  *Id.*

MCPS used the same criteria—universal screening, peer grouping, and local norming— in 2020 to select students for the magnet programs for the 2020-2021 school year.  *Id.* ¶ 74. Now, with three years of field test and post-field test data, MCPS has reported the following

---

[7] In the same year, MCPS adjusted the number of seats available at each of the four magnet programs.  *Id.* ¶ 67.  Specifically, Eastern gained 28 seats (from 142 students to 170); Takoma Park gained 20 (from 137 to 157); MLK gained 3 (from 95 to 98 students), but Clemente decreased from 86 to 84 seats.  *Id.*

demographic changes at the middle school magnet programs:[8]

### Takoma Park STEM Program

|  | Pre-Field Test (2017-2018) | Field Test (2018-2019) | Local Norming (2019-2020) | Same Criteria (2020-2021) |
|---|---|---|---|---|
| Asian American | 39.3% | 31.4% | 28.0% | 35.4% |
| White | 35.6% | 38.7% | 43.9% | 41.5% |
| Hispanic | 11.1% | 8.8% | 7.0% | 10.9% |
| Black | 7.4% | 13.9% | 14.0% | 12.2% |

ECF No. 1-2 at 2; ECF No. 1-3 at 11; ECF No. 1-4 at 12.

### Eastern Humanities Program

|  | Pre-Field Test (2017-2018) | Field Test (2018-2019) | Local Norming (2019-2020) | Same Criteria (2020-2021) |
|---|---|---|---|---|
| Asian American | 26.4% | 18.3% | 22.4% | 23.9% |
| White | 45.0% | 39.4% | 48.2% | 47.3% |
| Hispanic | 7.0% | 16.2% | 10.6% | 8.0% |
| Black | 12.4% | 14.8% | 11.8% | 11.2% |

ECF No. 1-2 at 3; ECF No. 1-3 at 10; ECF No. 1-4 at 10.

### Clemente STEM Program

|  | Pre-Field Test (2018-2019) | Field Test Expanded (2019-2020) | School Year (2020-2021) |
|---|---|---|---|
| Asian American | 64.% | 57.1% | 44.4% |
| White | 14.0% | 22.6% | 21.1% |
| Hispanic | -- | -- | 11.1% |
| Black | -- | -- | 14.4% |

ECF No. 1-3 at 12; ECF No. 1-4 at 9.

### MLK Humanities Program

|  | Pre-Field Test (2018-2019) | Field Test Expanded (2019-2020) | School Year (2020-2021) |
|---|---|---|---|
| Asian American | 58.9% | 38.8% | 24.3% |
| White | 16.8% | 30.6% | 37.5% |
| Hispanic | -- | -- | 14.7% |
| Black | -- | 14.3% | 12.5% |

---

[8] The percentages for each admitted class do not total 100% on account of students having identified as "two or more races." *See, e.g.*, ECF No. 1-4 at 12.

ECF No. 1-3 at 12; ECF No. 1-4 at 11.

Overall, the comparative data demonstrates that for the most part, the percentage of Asian American students in the middle school magnets has declined, in two programs substantially so. By contrast, the percentages of Black, Hispanic, and white students fluctuated, but each group has experienced increases in at least one magnet middle school.[9]

### E.   This Lawsuit

On September 1, 2020, Plaintiff AFEF filed suit on behalf of its organization's members, challenging the field test admissions criteria for the middle school magnet programs.  ECF No. 1 ¶ 8.  AFEF contends the field test, while "race neutral," visits a discriminatory impact on Asian American students and was implemented with a discriminatory intent or purpose.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).   As a parent-led organization formed to "ensure transparency, integrity, and consistency in the selection process for MCPS' magnet middle school programs and other forms of enriched and accelerated instruction," AFEF's membership includes many parents of Asian American students enrolled in MCPS.  ECF No. 1 ¶¶ 8–9, 11.  Several members have elementary-school-age children who intend to apply to these magnet programs in the near future, and who will be directly affected by the field test admissions criteria.[10]  *See id.*

---

[9] Although AFEF is silent on the field test's effect on the number of FARMS students invited to the middle school magnet programs, the increase is substantial at all four programs.  ECF No. 1-3 at 10–11; ECF No. 1-4 at 9–12.

[10] They include Chen Lai, whose child A.Y., as of the filing of the Complaint, was a fourth grader at Bells Mill Elementary School; George Yan, whose child G.Y. was a fourth grader at Cold Spring Elementary School; Zhou Wang, whose child A.W. was a fourth grader at Travilah Elementary School; Jing Wang, whose child G.Y. was a first grader at Wayside Elementary School; Yinan Liu, whose child C.Y. was a kindergartener at Wayside Elementary School; and AFEF president Yuxiang Xie, whose child M.Z. was a kindergartener at Fallsmead Elementary School.  ECF No. 1 ¶ 11.

F.       **Subsequent Changes to Middle School Magnet Admissions Criteria**

After AFEF filed this action, MCPS changed the magnet middle school admissions

process once again, announcing the changes on December 4, 2020 for the 2021-2022 school

year.  *See* ECF No. 27-2.  According to MCPS, these changes were prompted by the abrupt shift

from in-person to remote learning caused by the Covid-19 pandemic.  ECF No. 27-3 ¶¶ 5–7, 21,

27.  Franklin attests that an MCPS working group customarily convenes every year to discuss

programmatic changes that may be necessary in light of ongoing data collection.  *Id.* ¶ 20.  The

2020 working group recognized that the Covid-19 pandemic would "pose challenges for how

MCPS screens and selects elementary school students" for its academically selective middle

school magnet programs.  *Id.* ¶ 7.   And so, by July 2020, the working group began exploring

alternatives to the admissions process because of Covid-19.  *Id.* ¶ 21.

By December 2020, the working group concluded that Covid-19 made unworkable

administering the CogAT exam.  *Id.* ¶¶ 8–12; ECF No. 27-2 at 1.  Students previously took the

CogAT in-person, which could not be safely accomplished during the pandemic.  ECF No. 27-3

¶ 13. And even if MCPS could safely administer the CogAT, doing so "raised serious equity

concerns."  *Id.* ¶ 15.  For instance, MCPS recognized that certain students with medically

vulnerable family members would be presented with the Hobson's choice of either skipping the

CogAT, thus forfeiting their chances of admission, or risking exposure to Covid-19.  *Id.* ¶ 14.

Nor could the CogAT be administered remotely without compromising the test's integrity.  *Id.* ¶¶

17–19.  Thus, MCPS pivoted to a new admissions process.

Although MCPS kept the field test's "universal screening," it made the final selection

from the larger cohort of qualified applicants by lottery.  *Id.* ¶¶ 32–34.  As to the lottery, the

working group began discussions about its utility as early as July 2020, as it had used lotteries in

the past for other programs.  *Id.* ¶¶ 25, 27, 31.  But it was not until several months later, after this lawsuit was filed, that MCPS decided to forego the field test criteria for selection by lottery from among the larger pool of qualified applicants.  *Compare* ECF No. 1 *with* ECF No. 27-2 at 1; ECF No. 27-3 ¶ 31.

To date, MCPS has not committed to whether it will keep some, all, or none of the field test admissions process in future years.  Indeed, according to Franklin, whatever selection criteria MCPS uses going forward will "[d]epend[]on the data MCPS gathers," and it "may" or may not include a lottery.  ECF No. 27-3 ¶ 35.  As for this year, MCPS "cannot definitively predict what screening and selection process MCPS will employ."  *Id.* ¶ 36.  At a hearing held earlier this month, MCPS, through counsel, reasserted that it had little intention of "disclaiming" future use of the field test admissions process.  *See* ECF No. 34.

With this background now in the foreground, the Court turns to the County's motions. ECF Nos. 21 & 27.

## II.    Standard of Review

The County moves to dismiss the Complaint on several grounds.  The County first contends that Plaintiff lacks standing.  ECF No. 21-1 at 18.  Standing implicates this Court's subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  *See Beck v. McDonald*, 848 F.3d 262, 269–70 (4th Cir. 2017); *see also Carrero v. Farrelly*, 310 F. Supp. 3d 542, 545 (D. Md. 2018).  "In a facial challenge, the defendant contends that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based," *Beck*, 848 F.3d at 270 (quotation omitted), and "the plaintiff is afforded the same procedural protection that exists on a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (quotation omitted); *see also S. Walk at*

*Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 181–82 (4th Cir. 2013) (quotation omitted).

The County also moves to dismiss on mootness and ripeness grounds, which similarly implicate this Court's subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1); ECF No. 27-1 at 13. In resolving these challenges, the Court is "to regard the pleadings' allegations as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). Plaintiff bears the burden of proving that subject-matter jurisdiction exists in the first instance, including that its claim is ripe for consideration. *See id.* Defendants, however, must "carry the burden of demonstrating that discontinuance has mooted the case." 13C Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Prac. & Proc. Juris.* § 3533.7 (3d ed. 2021); *see also Feldman v. Pro Football, Inc.*, 579 F. Supp. 2d 697, 706 (D. Md. 2008) ("The party asserting mootness bears the burden of persuading the court that the challenged conduct will not recur." (citation omitted)).

Lastly, the County moves to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Fed. R. Civ. P. 12(b)(6); ECF No. 21-1 at 27. A motion to dismiss brought pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). The Court accepts "the well-pled allegations of the complaint as true," and construes all facts and reasonable inferences most favorably to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). To survive a motion to dismiss, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted); *see*

*also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). When ruling on a motion to dismiss, the Court may consider materials attached to the complaint, or incorporated by reference, without transforming the motion into one for summary judgment. *See* Fed. R. Civ. P. 10(c); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Court may also take judicial notice of facts which are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Kayle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011).

### III. Standing

Because the question of standing implicates this Court's power to hear the case, it must be addressed at the outset. Article III of the United States Constitution makes clear that federal courts are ones of limited jurisdiction, hearing only live "cases" and "controversies." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992); U.S. Const. art. III, § 2. A legal action meets the case-or-controversy requirement where the "questions [are] presented in an adversary context." *Mass. v. E.P.A.*, 549 U.S. 497, 516 (2007) (quotation omitted).

A party's standing to maintain an action "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Davis v. F.E.C.*, 554 U.S. 724, 733 (2008) (citations omitted). Standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Overbey v. Mayor of Balt.*, 930 F.3d 215, 227 (4th Cir. 2019) (quotation omitted). Because the County levels a facial challenge to standing, the Court must "accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party." *S. Walk*, 713 F.3d at 181–82 (quotation omitted). The Court must also assume that AFEF will prevail on the merits of its constitutional claims, but nonetheless

21

ascertain whether the Complaint makes plausible a cognizable injury-in-fact arising from such violations.  *See Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011).

AFEF asserts that it maintains associational standing to sue on behalf of its members. ECF No. 22 at 22.  To establish associational standing, AFEF must show that: "(1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit."  *S. Walk*, 713 F.3d at 184 (quotation omitted).

The County only takes issue with the first prong: whether any of AFEF's individual members has standing to sue.  ECF No. 21-1 at 18–19.  The Court accordingly focuses on whether "at least one" AFEF member maintains standing to pursue a claim in his or her own right.[11]  *S. Walk*, 713 F.3d at 184 (quotation omitted).  To satisfy this requirement, AFEF must plausibly aver that one of its members has: (1) "an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) the injury is capable of redress "by a favorable decision."  *Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009) (quotations omitted).

When viewing the Complaint facts as true and most favorably to AFEF, at least one parent member, George Yan ("Yan"), has standing to sue on behalf of his child, G.Y.[12]  G.Y. is

---

[11] The County does not dispute that AFEF has sufficiently demonstrated that the interests it seeks to protect in this litigation are "germane to [its] purpose" as an organization.  *S. Walk*, 713 F.3d at 184.  Further, because AFEF seeks injunctive relief, individual member participation in the litigation is unnecessary.  *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *see also United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) ("*Hunt* held that 'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members.").

[12] Although the student, G.Y., will suffer the claimed injury on account of the field test criteria, Yan, as his parent, may "validly claim" G.Y.'s injury on his behalf.  *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,

currently a fifth grader at Cold Spring and will apply for admission to the middle school magnet programs this year.  ECF No. 1 ¶ 11; *see Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 272–73 (S.D.N.Y. 2019) (finding that parent of eighth grader applying to specialized high school had standing to challenge facially race-neutral changes to high school admissions criteria).  Accordingly, G.Y. faces a non-speculative risk that he will be subject to the field test admissions process.  Thus, any claimed injury that flows from G.Y.'s applying to the magnet middle schools under the field test criteria is actual and imminent.  *See Christa McAuliffe*, 364 F. Supp. 3d at 272; *see also Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718–19 (2007) (finding standing for parents "whose elementary and middle school children may be denied admission to the high school of their choices when they apply for those schools in the future" (quotation omitted)).

G.Y.'s injury is also concrete and particularized.  Injury in the equal protection context amounts to "denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."  *Christa McAullife*, 364 F. Supp. 3d at 273 (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); citing *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003)); *see also Boston Parent Coal. for Acad. Excellence v. City of Boston*, No. WHY-21-10330, 2021 WL 1422827, at *9 (D. Mass. Apr. 15, 2021) (finding plaintiffs had standing where new plan "ma[de] it more difficult for them to be admitted when compared to applicants from other zip codes"), *withdrawn on other grounds* No. WHY-21-10330, 2021 WL 3012618, at *1 (D. Mass. July 9, 2021); *Boyapati v. Loudon Cnty. Sch. Bd.*, No. AJT/IDD-20-1075, 2021 WL 943112, at *6 (E.D. Va. Feb. 19, 2021).  As a student at Cold Spring, G.Y. will be forced to compete with his locally normed peer group, and

---

551 U.S. 701, 719 (2007); *see also Lewis v. Ascension Parish Sch. Bd.*, 662 F.3d 343, 347 (5th Cir. 2011); Fed. R. Civ. P. 17(c)(1)(A).

thus will be disproportionately burdened by the field test admissions criteria.  ECF No. 1 ¶¶ 11, 63, 66, 68.

Cold Spring enjoys a disproportionately large number of high performing students, so it is plausible that with local norming, Cold Spring students who receive top CogAT scores will have their scores adjusted downward when compared to other students from low-poverty schools.  *Id.* ¶¶ 64, 66; ECF No. 22-1 at 2.  Local norming, in other words, makes it harder for students like G.Y. to compete for magnet school spots even though they may score higher than students from other schools.  *See id*.  Likewise, the peer group rule gives MCPS unfettered discretion to reject any student who will have a highly able peer group at their local middle school, including Cold Spring students who will otherwise attend the top-performing Cabin John Middle School.[13]  *See* ECF No. 1 ¶¶ 63–64; ECF No. 22-1 at 2.

Last, these changes, as implemented, plausibly give MCPS flexibility in adjusting the racial composition of the magnet programs.  *See* ECF No. 1 ¶¶ 48, 50–51, 56, 62, 64.  Although the true purposes of the changes will no doubt be fully explored in discovery, AFEF has certainly made this articulated goal plausible.  That 12 Asian American students from Cold Spring scored in the 99th percentile on the CogAT but were denied admission in 2018 lends credence to this inference.  *Id.* ¶ 64.  Thus, it is plausible that the field test criteria will disadvantage G.Y., such that he will not compete on "equal footing" on account of his race.  *Id.* ¶ 10; ECF No. 22 at 9.

For this reason, the County's contention that Plaintiff has not shown plausibly how any

---

[13] The Court may take judicial notice that less than 5% of the students at Cold Spring are eligible for free or reduced lunch, which makes plausible that Cold Spring is treated as a low-poverty school for purposes of local norming.  *See* ECF No. 22-1 at 2; *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004).  The Court also takes judicial notice that Cabin John Middle School is the home school for Cold Spring students.  *See* ECF No. 22 n.5; ECF No. 22-1 at 2; *Hall*, 385 F.3d at 424 n.3.  The County's assertion that the Court can only take judicial notice of matters of public record if they benefit the defendant is entirely incorrect.  *See* ECF No. 24 at 10; *Tellabs*, 551 U.S. at 322 (citing 5B Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc*. § 1357 (3d ed. 2004) (In resolving a Rule 12(b)(6) motion, the "court is not limited to the four corners of the complaint," and "items subject to judicial notice" such as "matters of public record" are "deemed to be part of every complaint by implication.")).

Asian American students "will fare any worse under MCPS's new process" is misdirected.  ECF No. 21-1 at 30; *see Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F. 3d 524, 542 (3d. Cir. 2011) (discussing *Parents Involved*, 551 U.S. at 718–19); *see also Christa McAuliffe*, 364 F. Supp. 3d at 273.  AFEF need not show "how participating in acceleration and enrichment programs at local schools meaningfully differs from participating in acceleration and enrichment programs at magnet schools."  ECF No. 21-1 at 21.  In the equal protection context, a student suffers a cognizable injury when "forced to compete . . . in a system" where race influences student outcomes, including in a competitive admissions process.  *Parents Involved*, 551 U.S. at 719; *see also Doe ex rel. Doe*, 665 F.3d at 542.  Accordingly, whether G.Y. will be offered some *other* enriched coursework at his local middle school does not render G.Y. any less injured as to the admissions process for the magnet programs.  It is enough that the magnet programs materially differ from the enrichment courses offered at the local middle schools and that G.Y. may be denied admission to that program under the field test.  *See* ECF No. 1 ¶ 22 (Metis Report confirming the "unique" experience these schools provide); *id.* ¶ 24 (complaints by parents and community members that premier magnet schools not accessible to all students, suggesting they are stronger academically); *id.* ¶ 33 (noting "strong academic outcomes" for magnet middle school students); MR at 96 (highlighting the "unique educational experiences," which "are not offered through honors or Advanced Placement in home schools").

The County, however, insists that G.Y. only sustains an "injury" for standing purposes once he is rejected from the magnet programs.  ECF No. 21-1 at 19.  This is because, the County argues, the injury as framed by the Supreme Court in *Parents Involved*—"being forced to compete in a race-based system that may prejudice plaintiff"—only applies where the challenged policy expressly disadvantages a student because of his race.  551 U.S. at 719; ECF No. 21-1 at

25–26.  The Court does not join the County in its odd reading of *Parents Involved*.   It is well settled that whenever the government "erects a barrier that makes it more difficult for members of one group to obtain a benefit . . . a member of [that] group . . . challeng[ing] the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing."  *Ne. Fla. Chapter*, 508 U.S. at 666; *see also Townes v. Jarvis*, 577 F.3d 543, 548 (4th Cir. 2009) (citing favorably *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 403–06 (6th Cir. 1999)).  This remains the standard whether the barrier is erected on account of an overtly race-based policy, or one that is facially race-neutral but motivated by discriminatory intent.  *See Arlington Heights*, 429 U.S. at 264 (finding sufficient "injury" where individual asserted facially race-neutral but nonetheless discriminatory zoning barriers "thwarted" his "quest" to find housing near his job).  Because G.Y.'s injury arises from the barriers to admission that the field test has erected, Yan, as his parent, has standing.

The County also challenges the other elements of individual standing—traceability and redressability—and so the Court briefly addresses why these elements are met here.  ECF No. 21-1 at 23.  G.Y.'s injury is "fairly traceable" to the field test admissions criteria; it is these criteria which make G.Y.'s chances of admission to one of these programs that much slimmer.  *Bishop*, 575 F.3d at 423.  Further, the injury would be redressable by a favorable decision that the challenged plan is unconstitutional.  *See id.*  As a remedy, the Court may enjoin the County from implementing the field test criteria, thus eliminating the burdens placed on G.Y. and allowing him to compete "on an equal basis."  *Ne. Fla. Chapter*, 508 U.S. at 666 & n.5.

For these reasons, at least one parent member of AFEF would individually have standing to challenge the field test criteria.  AFEF, therefore, retains associational standing.  The County's

26

motion to dismiss is denied on this ground.

The Court next turns to the County's mootness and ripeness challenges.

**IV.      Mootness and Ripeness**

The County centers its mootness and ripeness challenges on its December 2020 decision to change the admissions process for the middle school magnet programs.  The County maintains these changes were in response to the Covid-19 pandemic, and because they materially alter the field test criteria, this action is now moot.  ECF No. 27-1 at 7.  The County similarly argues that to the extent the Complaint can be read as challenging the Covid-related selection process instead, this case is not yet ripe.  *Id.*

The ripeness argument is easily disposed.  The Complaint was filed *before* the pandemic plan had been announced and has not since been amended.  *Compare* ECF No. 1 *with* ECF No. 27-2 at 1.  The Complaint obviously does not challenge the pandemic-related changes.  Thus, the ripeness argument need not be addressed.  *See* ECF No. 28 at 16–17.

As for mootness, the Court recognizes that "subsequent events can moot an otherwise validly raised claim" when "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *Deal v. Mercer Cnty. Bd. of Ed.*, 911 F.3d 183, 191 (4th Cir. 2018) (quotations omitted).  The County rightly underscores that while the pandemic admissions plan kept one aspect of the field test (universal screening), it otherwise abandoned many other aspects of the field test in favor of lottery selection.  In this respect, these changes may raise the possibility that any opinion on the challenged field test amounts to a dead letter.  But that possibility alone does not render the case moot.

It is well established that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  *Porter v.*

*Clarke*, 852 F.3d 358, 363 (4th Cir. 2017) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).  "If it did, the courts would be compelled to leave the defendant . . . free to return to [its] old ways."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quotation omitted).  When a party claims that it voluntarily ended the challenged policy or practice, the Court must consider whether the cessation is a temporary alteration of "questionable behavior" to evade judicial review, or rather a permanent change that obviates the need for judicial intervention.  *Porter*, 852 F.3d at 364 (quotation omitted).  Accordingly, when a defendant maintains that voluntary cessation moots the action, the defendant bears a "'*formidable burden* of showing that it is *absolutely clear* the allegedly wrongful behavior could not reasonably be expected to recur.'"  *Id.* at 366 (emphasis added) (quoting *Laidlaw*, 528 U.S. at 190); *see also Telco Comms., Inc. v. Carbaugh*, 885 F.2d 1225, 1231 (4th Cir. 1989) (explaining "[j]urisdiction . . . may abate if there is no reasonable expectation that the alleged violation will recur and interim events have completely and irrevocably eradicated the effects of the violation" (quotation omitted)); *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014) ("heavy burden" of showing "challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness" (quotations omitted)).

Here, the County has not met this formidable burden.  For one, its professed intentions hardly make clear whether it will resurrect the field test in the future.  Rather, MCPS equivocates, asserting that it "may" or may not return to the challenged criteria.  ECF No. 27-1 at 12 (MCPS "*may* maintain aspects" of the field test in the future).  This alone renders the current challenge very much alive.  *Cf. Parents Involved*, 551 U.S. at 719 (noting the school district "nowhere suggests that if this litigation is resolved in its favor it will not resume using race to assign students").

Nor has the County provided this Court with the formal or substantiated assurance needed to meet its burden. *See Wade*, 741 F.3d at 497; *Telco*, 885 F.3d at 1231 (conceding the "unconstitutionality" of the challenged conduct); *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 349 (4th Cir. 2017) (accepting "formal assurances" in "sworn affidavit" by public official when combined with "no hint" in record that agency "inten[ded] to reenact the offending policies"); *Porter*, 852 F.3d at 364.  In fact, given the significant resources of time and money poured into the Metis Report and the resulting field test criteria, coupled with MCPS' non-committal response to whether it will use these criteria going forward, the Court cannot find that the County has officially, or even informally, renounced use of the field test criteria.  Thus, because the County still "retain[s] the authority and capacity to repeat an alleged harm," the case is not moot. *Porter*, 852 F.3d at 364–65 (quotations omitted); *see also Pashby v. Delia*, 709 F.3d 307, 316–17 (4th Cir. 2013) (finding an action not moot where the government retains authority to "reassess . . . at any time" the change and revert to the challenged policy).

In response, the County presses that MCPS began considering the benefits of a lottery system before the Complaint was filed, and so its voluntary cessation of the challenged plan does not qualify as an exception to the mootness doctrine.  ECF No. 27-1 at 17.  In support, the County extracts—from a footnote in *Porter*—the notion that "voluntary cessation of challenged conduct" will only moot the case when the cessation is "at least somewhat related to the pending litigation."  852 F.3d at 364 n.3.  But in the same footnote, the Fourth Circuit explains that "regardless of when the policy changes were first considered, the changes were made only after this case was initiated and they came only after Defendants' vigorous resistance to change for several years."  *Id.*  This is hardly the kind of bold pronouncement that any time a defendant considers implementing a change in the challenged policy prior to litigation, the defendant may

moot a case by following through on those considerations after it is sued.  *See id.; see also Wade*, 741 F.3d at 498 n.8.

In any event, this Court is unpersuaded that the pandemic plan was not motivated, at least in part, by this litigation.  On this point, Franklin's affidavit is equally insightful for what it does *not* say; it does not explain why MCPS waited until December 2020, three months after this lawsuit commenced, to announce the changes.  *See* ECF No. 27-2 at 1.  Nor does it explain why MCPS abandoned certain field test criteria, like the peer group measure, which seemingly could have been implemented without impediment during Covid.  *See* ECF No. 27-3.  Indeed, the timing alone "indicates that the change was at least somewhat related" to this litigation.  *Wade*, 741 F.3d at 498 n.8.

Anticipating this outcome, the County asserts that as a government actor, it should be held to "less demanding burden of proof than private defendants."  *Id.* at 497 (citation omitted); *see* ECF No. 27-1 at 17–18.  It asks that this Court not to assume MCPS acted "in bad faith" or that it harbors "hidden motives to reenact" the challenged policy once a court "dismisse[s] [a] case."  ECF No. 27-1 at 17–18 (quoting *Fed'n of Advert. Indus. Reps., Inc. v. City of Chicago*, 326 F.3d 924, 929 (7th Cir. 2003)).  But the Court is not presuming bad faith.  It is merely taking the County's equivocation at face value and from that, concluding that the County has fallen short of demonstrating the claims are moot.[14]  Thus, the Court must turn to the merits of AFEF's equal protection claim.

---

[14] The Court alternatively declines to dismiss the action on prudential mootness grounds.  *See* ECF No. 27-1 at 16 (citing *Goldstein v. F.D.I.C.*, No. ELH-11-1604, 2014 WL 69882, at *11 (D. Md. Jan. 8, 2014); *S-1 v. Spangler*, 832 F.2d 294, 297 (4th Cir. 1987)).

## V.        Equal Protection Challenge

AFEF alleges the field test criteria intentionally disadvantage Asian American students in competing for coveted magnet school spots on account of their race.  The Equal Protection Clause of the Fourteenth Amendment prohibits states from denying "to any person within its jurisdiction the equal protection of the laws.'"  *Fisher v. King*, 232 F.3d 391, 399 (4th Cir. 2000) (quoting U.S. Const. amend. XIV, § 1).  Thus, a state cannot "purposely discriminat[e] between individuals on the basis of race" without running afoul of the Fourteenth Amendment.  *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)). Intentional discrimination occurs when: "(1) a law or policy explicitly classifies citizens on the basis of race; (2) a facially neutral law or policy is applied differently on the basis of race; or (3) a facially neutral law or policy that is applied evenhandedly is motivated by discriminatory intent and has a racially discriminatory impact."  *Doe ex rel. Doe*, 665 F.3d at 543 (citations omitted); *see also N.C. State Conf. of NAACP v. McCory*, 831 F.3d 204, 220 (4th Cir. 2016); *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 819 (4th Cir. 1995).

If the plaintiff proves intentional discrimination under any one of these methods, the Court must next determine whether the challenged conduct satisfies "strict scrutiny."  *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999).  Strict scrutiny is a "searching standard of review"; it demands that the government demonstrate the challenged conduct is "narrowly tailored to achieve a compelling interest."  *Parents Involved*, 551 U.S. at 720 (quotation omitted).  By contrast, if the challenged conduct was not motivated by a discriminatory purpose or intent, then the Court applies rational basis review.  *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271–72 (1979); *see also Doe ex rel. Doe*, 665 F.3d at 544.  Under rational basis review, the government need only establish the challenged conduct or policy is rationally related to a

legitimate government interest.  *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

Rational basis review affords the challenged policy "a strong presumption of validity," and the

policy "must be upheld . . . if there is any reasonably conceivable state of facts that could provide

a rational basis" for it.  *Heller v. Doe*, 509 U.S. 312, 320 (1993) (quotation omitted).  Thus, for

all practical purposes, the level of scrutiny applied to the challenged policy often dictates

whether it survives challenge.  *See, e.g.*, *Boyapati*, 2021 WL 943112, at *9–10.

      In reviewing the sufficiency of the equal protection claim, certain fundamental

considerations bear advance discussion.  First, although disparate impact alone does not also

demonstrate a sufficient intent to discriminate, it may be considered alongside other evidence

that suggests the challenged policy was implemented with a discriminatory purpose.  *See*

*McCory*, 831 F.3d at 220–221 (quoting *Davis*, 426 U.S. at 242; citing *Arlington Heights*, 429

U.S. at 266–67).

      Second, a local government may take race into consideration in its policymaking and not

run afoul of the Equal Protection Clause.  *See Doe ex rel. Doe*, 665 F.3d at 548 ("Designing a

policy with racial factors in mind does not constitute racial classification if the policy is facially

neutral and is administered in a race-neutral fashion.").  It may, for example, study the effects of

its policies on racial groups, or consider those effects as part of its policymaking role.  *See id.*

("The Court has never held that strict scrutiny should be applied to a school plan in which race is

not a factor merely because the decisionmakers were aware of or considered race when adopting

the policy."); *see also Spurlock v. Fox*, 716 F.3d 383, 395 (6th Cir. 2013) (finding "demographic

ignorance" is not required "during the policymaking process").  However, a crucial difference

exists between "being aware of racial considerations and being motivated by them."  *Miller v.*

*Johnson*, 515 U.S. 900, 916 (1995); *see also United States v. Hays*, 515 U.S. 737, 745–46

(1995); *Doe ex rel. Doe*, 665 F.3d at 548 ("The consideration or awareness of race while developing or selecting a [school rezoning] policy, however, is not in and of itself a racial classification.").  Where the challenged policy was implemented "because of, not merely in spite of" race, that policy amounts to intentional discrimination.  *Sylvia*, 48 F.3d at 819 n.2 (quotation omitted); *see also Arlington Heights*, 429 U.S. at 265–66; *Doe ex rel. Doe,* 665 F.3d at 552 ("Racially discriminatory purpose means that the decisionmaker adopted the challenged action at least partially because the action would benefit or burden an identifiable group.").

On this point, divining the intent behind a challenged policy requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *McCory*, 831 F.3d at 220 (quoting *Arlington Heights*, 429 U.S. at 266).  This Court is to consider "[t]he historical background of the [challenged] decision; [t]he specific sequence of events leading up to the challenged decision; [d]epartures from normal procedural sequence; the legislative history of the decision; and of course, the disproportionate impact of the official action—whether it bears more heavily on one race than another."  *Id.* at 220–21 (quoting *Arlington Heights*, 429 U.S. at 266–67).

Third, the prohibition against "intentional discrimination" applies regardless of whether the challenged policy was well intentioned.  *Parents Involved*, 551 U.S. at 720 (citing *Johnson v. California*, 543 U.S. 499, 505–06 (2005)).  Even "benign remedial aims" remain "inherently suspect and thus call for the most exacting judicial examination."  *Md. Troopers Ass'n v. Evans*, 993 F.2d 1072, 1076 (4th Cir. 1993) (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273 (1986) (plurality opinion); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989)); *see also Eisenberg*, 197 F.3d at 128.

Last, the plaintiff "need not show that discriminatory purpose was the sole[ ] or even a

primary motive for the legislation, just that it was a motivating factor." *McCory*, 831 F.3d at 220 (quotation omitted); *see also Arlington Heights*, 429 U.S. at 265–66 (same). "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265. So long as race motivated the challenged conduct, strict scrutiny applies. *See Doe ex rel. Doe*, 665 F.3d at 551 (quoting *Arlington Heights*, 429 U.S. at 266–67); *McCory*, 831 F.3d at 221 (Upon finding that race was a motivating factor, the "burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." (quotation omitted)).

 With these principles in mind, the Court turns to Plaintiff's equal protection challenge. Plaintiff alleges intentional discrimination and so must make plausible that the field test disparately impacted Asian American students and was enacted with a discriminatory purpose. *See Arlington Heights*, 429 U.S. at 265; *see also Doe ex rel. Doe*, 665 F.3d at 549–50 (quoting *Palmer v. Thompson*, 403 U.S. 217, 224 (1971)). As to disparate impact, no real dispute exists that the field test criteria disproportionately affected Asian American students. *See* ECF Nos. 21-1 & 34. Since the field test was implemented, the acceptance rate for Asian American students has dropped at each of the programs. *See supra* at 16–17; *see also Lewis v. Ascension Parish Sch. Bd.*, 662 F.3d 343, 352 (5th Cir. 2011) (looking to the percentage increase of at-risk students at Plaintiff child's assigned school to measure discriminatory impact); *Boyapati*, 2021 WL 943112, at *8 (finding plausible that new plan will have disproportionately negative effect on Asian American applicants "when compared with previous admission levels at certain middle schools"). In particular, the percentage of Asian American students at the Downcounty programs has overall declined when compared to pre-field test data. *See supra* at 16. As for the

34

Upcounty programs, Asian American enrollment has fallen precipitously.  *See id.*

Moreover, the Complaint makes plausible that the field test criteria, particularly local norming and peer grouping, were responsible for this decline.  According to AFEF, Asian American students are clustered in a handful of high-performing, low-poverty elementary schools, and so local norming and peer grouping doubly disadvantage them.  *See* ECF No. 1 ¶¶ 52–53, 56, 63–66, 72–73.  With local norming, high-performing students, including Asian Americans, who score in the highest percentiles nationally will, in all likelihood, rank lower if only compared to their local peers.  *See id.* ¶ 66.  Similarly, the peer group rule provides MCPS the flexibility to deny admission to those students defined as "highly able" according to standardized tests and assessments.  *Id.* ¶¶ 56, 62–64.

For example, although it is unclear when or how MCPS invokes this rule, its implementation resulted in denying admission to 12 Cold Spring students who had scored in the 99th percentile, all of whom were Asian American.  *See id.* ¶¶ 62, 64.  This connection is further strengthened when considering that Asian American students earned a higher share of the seats at the Upcounty programs in 2018 where the field test had not yet been implemented, and in sharp contrast to the Downcounty schools.  *See* ECF No. 22 at 31; ECF No. 1 ¶¶ 52–53, 55.  Given these facts, Court finds plausible that the challenged criteria caused this disparate impact.

The Complaint also makes plausible that the County acted with a discriminatory motive in that it set out to increase and (by necessity) decrease the representation of certain racial groups in the middle school magnet programs to align with districtwide enrollment data.  *Cf. Eisenberg*, 197 F.3d at 131.  Looking to the "history" of these changes, *McCory*, 831 F.3d at 220 (citation omitted), the Metis Report documents MCPS' noble pursuit of excellence in education while avoiding racial isolation.  MR at 29–48; *cf. Md. Troopers*, 993 F.2d at 1076.  The Metis Report

35

continues this tradition by recommending changes to the admissions process for MCPS'
academically selective programs to correct for "significant racial and socioeconomic disparities."
MR at 9–10 (finding certain groups "underrepresented" relative to "districtwide enrollment
data."). In the end, the Board embraced the Metis Report and charged Smith with implementing
this key "recommendation." ECF No. 1 ¶ 35.

Board members' public statements underscore that the field test was implemented, at
least in part, to readjust the racial composition of the magnet programs. *See id.* ¶¶ 36, 39, 41,
43–44, 58, 60. As O'Neill noted, MCPS was simply "not doing a very good job of bringing in
African American and Latino students" into the magnet programs. *Id.* ¶ 36. Docca likewise
echoed that the Board "just can't let this happen," and that the Board must take action to mitigate
racial disparities in similar programming. *Id.* ¶ 41. Member Barclay similarly urged MCPS to
go further than a "blind and neutral" process, pressing the district to implement "controls" so the
programs would "reflect the community that we live in, and . . . address some of the disparities
that exist." [15] *Id.* ¶ 43.

Although discovery will certainly bear out whether these comments bespeak an intent to
racially balance the middle magnet programs, such an inquiry is intensely fact-driven and not
capable of resolution at this stage. For now, the Court must construe the statements most
favorably to AFEF, even if the comments may, in the end, be of "limited value" to the finder of
fact. *McCory*, 831 F.3d at 229 (citations omitted); *see also Doe ex rel. Doe*, 665 F.3d at 540
(accepting the district court's finding that while some board members "considered diversity
among other factors when considering" the proposed plans, "race was not the basis of their
votes"); *see also Lewis*, 662 F.3d at 350 (looking at deposition testimony of multiple

---

[15] The County is simply not correct that the Board member statements are "race-neutral."
*Compare* ECF No. 21-1 at 34 *with* ECF No. 1 ¶¶ 36, 39, 41, 47 n.18, 57–58, 60 n.36.

decisionmakers).

The County next urges that the Court construe these comments as no more than mere consideration of racial demographic data, which alone does not amount to intentional discrimination.  *See* ECF No. 21-1 at 30 (citing *Hays*, 515 U.S. at 745–46; *Spurlock*, 716 F.3d at 395).  While it is true that the County may remain "race conscious" in its policy making, *see Doe ex rel. Doe*, 665 F.3d at 548; *Spurlock*, 716 F.3d at 398–99; *Lewis*, 665 F.3d at 349, the Complaint facts, viewed most favorably to Plaintiff, make plausible that the County went further. The County certainly considered the impact that the field test had on the racial composition of the magnet schools; but it also voiced a goal of changing the racial composition of these programs.  *See* ECF No. 1 ¶¶ 36, 39, 41, 43–44, 58, 60.  At this stage, the Complaint allows the reasonable inference that the County wished to engage in a form of racial balancing; and that, as pleaded, makes plausible the field test was implemented with a discriminatory purpose.

Along the same lines, the County presses that *Parents Involved* compels the conclusion that a facially race-neutral policy enacted to achieve "race-conscious goals" such as "boosting diversity" does not amount to intentional discrimination triggering strict scrutiny.  *See* ECF No. 21-1 at 30–31, 36.  To get there, the County urges the Court to read *Parents Involved* and, more pointedly, Justice Kennedy's concurrence, in a manner simply not supported by the opinion itself.

In *Parents Involved*, the Supreme Court was called upon to decide the constitutionality of two school assignment plans, one implemented by the Seattle School District in Seattle, Washington and the other by Jefferson County Public Schools in Louisville, Kentucky.  551 U.S. at 709–18.  In each plan, the school district expressly "relied upon an individual student's race in assigning that student to a particular school, so that the racial balance at the school f[ell] within a

predetermined range based on the racial composition of the school district as a whole." *Id.* at 710.

The plurality opinion, written by Chief Justice Roberts, framed the question as "whether a public school that had not operated legally segregated schools or has been found to be unitary may choose to classify students by race and rely upon that classification in making school assignments." *Id.* at 711.  In a splintered decision that has since generated confusion for scholars and courts alike, a four-Justice plurality held that the plans violated the Equal Protection Clause on two grounds: first, "in design and operation, the plans [we]re directed only to [achieve] racial balance," a "patently unconstitutional" objective; and second, even if the plans had furthered a compelling government interest, they were not narrowly tailored.  *Id.* at 726, 729–30, 734.  Central among these reasons was the "minimal effect these classifications ha[d] on student assignments," which "cast[] doubt on the necessity of using racial classifications."  *Id.* at 733–34.

As a fifth vote, Justice Kennedy expressly "join[ed] Part III-C of the Court's [plurality] opinion" in that he "agree[d] that in the context of these plans, the small number of assignments affected suggests that the schools could have achieved their stated ends through different means."  *Id.* at 790.  However, Justice Kennedy, also concerned that the plurality opinion "impl[ied] an all-too-unyielding insistence that race cannot [ever] be a factor," *id.* at 787, wrote separately to make the case for why "diversity, depending on its meaning and definition" can be a "compelling educational goal," *id.* at 783.  "[G]eneral policies to a encourage a diverse student body," Justice Kennedy noted, may be constitutional if they remain "race-conscious," and free of "systematic, individual typing by race."  *Id.* at 788–89.  But in the end, Justice Kennedy confined his agreement with the plurality to viewing the challenged plans as not narrowly tailored to serve a compelling government interest.  *See id.* at 790.

The County, however, treats the entire concurrence by Justice Kennedy as the "controlling opinion" for purposes of interpreting the precedential effect of *Parents Involved*. ECF No. 21-1 at 31.  This is incorrect.  Under *Marks v. United States*, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."  430 U.S. 188, 193 (1977).  Here, even if reasonable minds could disagree as to whether five Justices joined expressly in one holding, clearly the "narrowest grounds" reached by the majority in *Parents Involved* were that the challenged policy had not been narrowly tailored to achieve its stated ends.  551 U.S. at 733, 790.  Accordingly, the entirety of Justice Kennedy's concurrence cannot be the "controlling opinion" that binds this Court.  *See Doe ex rel. Doe*, 665 F.3d at 544 n.32; *see also Christa McAuliffe*, 364 F. Supp. 3d at 282 n.25; *but see Spurlock*, 716 F.3d at 395; *Boston Parent Coalition for Acad. Excellence v. City of Boston*, 996 F.3d 37, 48–49 (1st Cir. 2021).

Alternatively, even if this Court found the whole of Justice Kennedy's concurrence persuasive, it does not yet spell victory for the County.  To be sure, Justice Kennedy urges that in the secondary school context, school boards should be free to "pursue the goal of bringing together students of diverse backgrounds and races" through mechanisms that are "race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race."  551 U.S. at 789.  Justice Kennedy underscores that such governing bodies should be permitted to take such steps "with confidence that a constitutional violation does not occur whenever a decisionmaker considers the impact a given approach might have on students of different races," as distinguished from a crude system of "[a]ssigning to each student a personal designation according to . . . individual racial classifications."  *Id.*

But in this case, the Court cannot ignore that the County's stated goal of "diversity"—for now at least—appears far more driven by race, and to some extent socioeconomics, than that which Justice Kennedy envisioned.  *See* ECF No. 1 ¶¶ 30, 36, 39, 41, 57–58, 60, 64, 88–89.  No doubt, it will remain part of the sensitive, fact-driven inquiry to ascertain whether, for instance, race was merely "one aspect" of an array of factors considered to "encourage a diverse student body."  *Parents Involved*, 551 U.S. at 788 (citations omitted); *cf. Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2207 (2016) (Kennedy, J., writing for majority) (accepting affirmative action policy where race is a "positive feature of a minority student's application" but is only a "factor of a factor of a factor in the holistic-review calculus"); *see also Grutter v. Bollinger*, 539 U.S. 306, 392–93 (2003) (Kennedy, J., dissenting) ("There is no constitutional objection to the goal of considering race as one modest factor among many others to achieve diversity, but an educational institution must ensure . . . that race does not become a predominant factor in the admissions decision-making.").  Or instead, whether the challenged criteria were implemented to racially balance the magnet programs, a goal distinctly at odds with Justice Kennedy's views on the kind of "diversity" that may be subject to a less searching judicial inquiry.  *See Parents Involved*, 551 U.S. at 789 (Kennedy, J., concurring) (endorsing the "goal of bringing together students of diverse backgrounds and races"); *see also Grutter*, 539 U.S. at 389 (Kennedy, J., dissenting) ("An effort to achieve racial balance among the minorities the school seeks to attract is, by the Court's own admission, patently unconstitutional." (quotation marks omitted)); *Fisher*, 570 U.S. at 2225 ("[R]acial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" (quoting *Parents Involved*, 551 U.S. at 732)).

The Court cannot untangle this knot today.  To ascertain the purposes of the changed

criteria—whether they be race-conscious or race-driven—requires further factual development. *See McCory*, 831 F.3d at 220; *Arlington Heights*, 429 U.S. at 266. For now, the Complaint makes plausible that the field test, while facially race neutral, was implemented to adjust or balance the racial groups within the middle school magnet programs. When viewed most favorably to the Plaintiff, the field test goes beyond permissible race-conscious considerations and appears designed to achieve a new racial equilibrium in the middle school magnet programs. Thus, the Complaint has made plausible that strict scrutiny must apply when assessing the constitutionality of the field test criteria.

Turning lastly to the application of strict scrutiny, although the County summarily argues that the field test is narrowly tailored to further a compelling government interest, this inquiry is ill-suited for resolution on the pleadings. *See* ECF No. 22 at 41 (citing *Deegan v. City of Ithaca*, 444 F.3d 135, 142 (2d Cir. 2006) (narrow tailoring is a "fact specific and situation specific inquiry")); *Parents Involved*, 551 U.S. at 783–84 (Kennedy, J., concurring) ("[T]he inquiry into less restrictive alternatives demanded by the narrow tailoring analysis requires in many cases a thorough understanding of how a plan works."); *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 314 (2013) ("Strict scrutiny must not be strict in theory but feeble in fact."). The Court, therefore, leaves this question for future resolution. The County's motion to dismiss for failure to state a claim is denied. *See* ECF No. 21.

**VI.     Conclusion**

For the foregoing reasons, the Court DENIES Defendants' motions to dismiss. ECF Nos. 21 & 27. A separate Order follows.

9/15/2021                                                             /s/
Date                                                            Paula Xinis
                                                                United States District Judge