## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ASSOCIATION FOR EDUCATION FAIRNESS | * | |
| | * | |
| Plaintiff, | | |
| | * | |
| v. | | Civil Action No. 8:20-cv-02540-PX |
| | * | |
| MONTGOMERY COUNTY BOARD OF EDUCATION, *et al.*, | * | |
| | * | |
| Defendants. | | |

*\*\*\**

## <u>MEMORANDUM OPINION</u>

This case concerns the constitutionality of the admissions criteria for four highly selective and academically rigorous middle school magnet programs offered by Montgomery County Public Schools ("MCPS"). These admissions criteria have prompted robust debate within MCPS about best practices for inclusion and equity in educational access, and in recent years, MCPS has modified the admissions criteria several times.

In September 2020, Plaintiff Association for Education Fairness ("AFEF"), an organization of "concerned Asian-American parents in Montgomery County," sued the Montgomery County Board of Education (the "Board") and MCPS' then-Superintendent, Dr. Jack R. Smith ("Dr. Smith") (collectively the "County"), alleging that recent changes to the admissions process aimed in part at increasing Black and Hispanic student enrollment violated the equal protection rights of excluded Asian American students. *See generally* ECF No. 1. The County moved to dismiss the Complaint, which this Court denied. *See* ECF Nos. 21 & 27; *Ass'n for Educ. Fairness v. Montgomery Co. Bd. of Educ.*, 560 F. Supp. 3d 929 (D. Md. 2021) ("*AFEF I*").

But the criteria challenged earlier in *AFEF I*, known as the "Field Test," are no longer in effect. Even before this litigation began in earnest, MCPS faced profound educational challenges stemming from the COVID-19 pandemic. *See* ECF No. 51 ¶¶ 4, 83, 86. MCPS' response to COVID-19 necessitated substantial changes to the magnet admissions process once again. *Id.* ¶¶ 83 & 86. MCPS confirmed it will employ this new process, known as the "Pandemic Plan," into the foreseeable future. *See* ECF Nos. 41 & 41-1. AFEF responded in kind, filing an Amended Complaint (ECF No. 51) in which it now challenges only the Pandemic Plan as intentionally discriminatory against Asian American students.

The County moves to dismiss the Amended Complaint (ECF No. 87), which AFEF opposes (ECF No. 95). The issues are fully briefed, and the Court finds no hearing necessary to resolve the pending motion. *See* D. Md. Loc. R. 105.6. For the following reasons, the Court GRANTS the motion to dismiss (ECF No. 87). The Court also DENIES as MOOT the motion to intervene (ECF No. 69) filed by *Amici Curiae*.

## I.     Background

For the last several decades, MCPS has provided middle school magnet programs in the humanities, math, and science for highly capable students. *AFEF I*, 560 F. Supp. 3d at 934–36. The Court has previously discussed the history of those magnet programs and need not repeat itself here. *See id.* Nonetheless, the current admissions process—the Pandemic Plan—must be placed in proper context, necessitating a brief review.

### A.  Magnet Middle School Admission Process Before This Lawsuit

The magnet admission process has historically been driven by parents' choice. *See* ECF No. 51 ¶ 48. That is, although all students *could* apply for admission, MCPS considered only those students whose parents *did* apply. *See AFEF I*, 560 F. Supp. 3d at 939 ("[T]he admission

process began with the parents of fifth-grade students submitting an application for consideration.").  Those student applicants next had to take the Cognitive Abilities Test ("CogAT"), an in-person written assessment designed to measure students' quantitative, verbal, and nonverbal skills.  *Id.*; *see also* ECF No. 51 ¶ 48.  MCPS reviewed the applicants' CogAT scores alongside their state assessment scores, report card grades, and teacher recommendations, and it offered the top performing students admission to one of the magnet programs.  ECF No. 51 ¶ 48.

Selected students were then placed in one of the two "Upcounty" programs housed at Robert Clemente and Martin Luther King Jr. middle schools, or in one of the "Downcounty" programs at Takoma Park and Eastern middle schools.  ECF No. 51 ¶¶ 21 & 22.  The magnet programs offer a challenging academic environment which cannot be attained through honors or advanced placement courses in the students' local schools.  *See id.* ¶ 23.  As a result, the demand for seats in these programs is high.

Over the years, MCPS grew increasingly concerned that the magnet programs and other academic programming did not align with the racial demographics of the larger MCPS student body.  *See AFEF* I, 560 F. Supp. 3d at 935–36.  For example, in the 2013–2014 school year, Black and Hispanic students represented nearly half of the MCPS student body, yet they accounted for less than 15% of the magnet school seats.  ECF No. 51 ¶ 26.  Conversely, Asian American students represented just 14.8% of the MCPS student body yet occupied nearly half of the seats.  *Id.*

This divergence prompted MCPS to renew its commitment to "educating each and every student so that academic success is not predictable by race, ethnicity, or socioeconomic status." ECF No. 51 ¶ 28 (emphasis omitted).  In 2013, the Board adopted a strategic planning

framework for addressing equity of access to MCPS' "choice" and "special" academic programs. *AFEF I*, 560 F. Supp. 3d at 936. Next, in 2015, the Board commissioned Metis Associates, Inc. to conduct a comprehensive study of MCPS' choice and special academic programs and discern whether those programs aligned with the school district's "core value of equity." MR at 16; *see also* ECF No. 51 ¶ 29. That comprehensive study (the "Metis Report" or "Report") was released in March 2016.[1] MR at 1.

The Metis Report documented "significant racial and socioeconomic disparities" in the programs' enrollment and acceptance rates. MR at 9 & 176. It specifically identified Hispanic, Black, limited English proficient, special education, and "FARMS"[2] students as "underrepresented" when compared to districtwide enrollment data. *Id.* at 9–10. The Report synthesized its observations and suggested remedial action in the following recommendation:

> **Recommendation 3a:** Implement modifications to the selection process used for academically competitive programs in MCPS, comprising elementary centers for highly gifted students and secondary magnet programs, to focus these programs on selecting equitably from among those applicants that demonstrate a capacity to thrive in the program, that include use of non-cognitive criteria, group-specific norms that benchmark student performance against school peers with comparable backgrounds, and/or a process that offers automatic admissions to the programs for students in the top 5-10% of sending elementary or middle schools in the district.

MR at 10.

This recommendation sparked much controversy. ECF No. 51 ¶¶ 36–45. Board members publicly lamented the low percentage of Black and Hispanic students enrolled in the magnet programs. *See, e.g., id.* ¶¶ 37, 40, 42. Some Board members questioned whether a

---

[1] The Metis Report is expressly incorporated by reference into the Amended Complaint (ECF No. 51), and the County does not question its accuracy or authenticity. The Court accepts the Metis Report as part of the Amended Complaint facts and construes it most favorably to AFEF. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). The Report is cited as "MR" throughout this decision.

[2] The "FARMS" designation refers to students who are eligible to receive free or reduced-price meals. *See AFEF I*, 560 F. Supp. 3d at 935.

4

"blind and neutral" process would be sufficient to produce the "equitable" results desired by MCPS, while parents of Asian American students expressed their opposition to the Report's findings, characterizing Recommendation 3a as an attempt to "lower" the existing rigorous standards required to gain admittance to the magnet programs. *See id.* ¶ 44; *AFEF I*, 560 F. Supp. 3d at 937–38.

### B.  2018–2019 School Year (Implementing the Field Test for Downcounty Programs)

On September 12, 2017, Dr. Smith announced that as part of MCPS' commitment to expand opportunity pursuant to the Metis Report, MCPS would implement several changes to the magnet admissions process. *See* ECF No. 51 ¶ 47.  For the first year of implementation, changes were applied to the Downcounty programs only.  *Id.*  Under the newly-developed Field Test, MCPS replaced parent-initiated applications with universal screening of all MCPS fifth graders. *Id.* ¶ 49.  MCPS now reviewed all fifth-grade students' report card grades and standardized test scores, and it invited roughly half of the student body to take the CogAT examination.  *See id.* ¶¶ 48–49.  The Field Test also eliminated teacher recommendations which had the potential to be "infected with racial bias."  *Id.* ¶ 50.

MCPS next compared a student's objective performance to the student's "peer group" at their local school.  ECF No. 51 ¶ 51.  Although it is not clear exactly how MCPS implemented peer grouping, AFEF alleges that Asian American students are "highly clustered in a relatively small number of MCPS' 135 elementary schools," and were thus more likely to be adversely affected by peer grouping.  *Id.* ¶ 52.

The results of the Field Test further fueled controversy about changing the magnet school admissions process.  While the percentage of Asian American students offered admission in the Downcounty programs declined, the Field Test had only a marginal effect on the rate of

admission for Black and Hispanic students.  *See* ECF No. 51 ¶¶ 53–55, 57–59.  In several

meetings held to discuss the Field Test results, Board members expressed frustration and concern

that the enrollment appeared largely unchanged for Black and Hispanic students.  *Id.* ¶¶ 58–60.

One Board member questioned the "slight" increase in Black student admissions, while another

Board member asked whether "some form of affirmative action, either socio-economic or

racial[]" could be implemented.  *Id.* ¶¶ 58 & 59.  Yet another commented that "MCPS was

systematically under-educating Black and Brown children," underscoring that "[r]hetorical

support for progress not matched with effective policies and structures to dismantle the barriers

and rapidly improve the material impact of said barriers is an old tool in the cynical American

political playbook."  *AFEF I*, 560 F. Supp. 3d at 940–41 (alteration in original) (quoting ECF

No. 1 ¶ 60 n.36).  Parents of Asian American students expressed disappointment for a different

reason:  at least a dozen Asian American students who scored in the 99th percentile on state

assessments and the CogAT were denied admission to a magnet program despite their impressive

academic credentials.  ECF No. 51 ¶¶ 57 & 65.

###     C. 2019–2020 and 2020–2021 School Years (Expansion of Field Test to Upcounty Programs)

In the face of heated debate, MCPS expanded the Field Test the following year to include

the Upcounty magnet programs.  *See* ECF No. 51 ¶ 66.  It also decided to "locally norm"

applicants' CogAT scores.  *Id.* ¶¶ 66 & 67.  Specifically, MCPS classified each elementary

school as either low-poverty, moderate-poverty, or high-poverty, and next compared students'

CogAT scores to other students within the same "poverty band."  *Id.* ¶ 67.  Because of the

demographic concentration of Asian American students in low-poverty schools, AFEF alleges

that this change was aimed at reducing Asian American representation while increasing

representation of Black and Hispanic students, who are more concentrated in mid- to high-poverty schools.  *Id.*

Asian American student acceptance as compared to pre-Field Test numbers declined over these school years, and at a few schools substantially so.  *See AFEF I*, 560 F. Supp. 3d at 952–53.  That said, Asian American student participation in magnet programs under the Field Test always outpaced the percentage representation of Asian Americans in MCPS countywide.  *See infra* Part III.A.

### D.  2021–2022 School Year (The Pandemic Plan)[3]

In March of 2020, COVID-19 upended all aspects of life, especially primary and secondary education.  *See, e.g.*, Donna St. George et al., *Maryland Cancels Classes for 900,000 Students Amid Coronavirus Fears*, Wash. Post (Mar. 13, 2020, 12:20 AM), https://www.washingtonpost.com/local/education/loudoun-county-public-schools-cancel-all-classes-through-march-20-due-to-coronavirus-concerns/2020/03/12/6e3eaf38-6457-11ea-845d-e35b0234b136_story.html; Megan U. Boyanton, *Coronavirus May Be Shutting Classrooms Yet Lunch Period Goes On*, Bloomberg Law (Mar. 9, 2020, 4:53 PM), https://bit.ly/3P8P7t6.  MCPS accordingly had to convert many of its educational programs to virtual learning in response to the public health crisis facing the schools.  *See* ECF No. 51 ¶¶ 83 & 84.  MCPS' Division of Consortia Choice and Application Program Services (the "Consortia"), a six-person working group that administers the magnet programs and other choice academic offerings, quickly began

---

[3] Although MCPS began formulating the Pandemic Plan in the summer of 2020, it did not implement the Plan until the 2021–2022 school year.  This is because MCPS administered the CogAT each fall, and so by the time the pandemic hit in March 2020, the admissions process for the 2020–2021 school year using the Field Test was already underway.  *See* ECF No. 27-3 ¶ 12 ("By the spring and early summer of 2020, however, MCPS realized that the COVID-19 pandemic might pose multiple challenges to administering the CogAT that coming fall.").

discussing necessary changes to the middle school magnet admissions process.  ECF No. 27-3 ¶¶ 12 & 20.[4]

Beginning in July of 2020, the Consortia first tackled the logistical difficulties that remote learning presented for administering the CogAT, which could not be given to students remotely without compromising test security or equity of access.  *See* ECF No. 51 ¶¶ 84 & 86; ECF No. 27-3 ¶¶ 13–18.  The Consortia initially considered delaying administration of the test, but uncertainty as to when the pandemic would permit safe, in-person testing rendered this option unworkable.  ECF No. 27-3 ¶¶ 12–19, 23.  The Consortia ultimately decided to abandon the CogAT altogether.  *See* ECF No. 51 ¶ 86; ECF No. 27-3 ¶ 33.

Next, the Consortia considered implementing a lottery selection system akin to that which MCPS was already using for other choice programs.  ECF No. 27-3 ¶ 25.  The Consortia reasoned that a lottery system has the added advantage of reducing selection bias and subjectivity, minimizing importance of statistically insignificant differences in standardized test scores, increasing program availability, and reducing bureaucratic burdens on the school district. *Id.* ¶ 26.  The lottery system also was logistically the simplest option given persistent remote work and instructional challenges arising from the pandemic.  *Id.* ¶¶ 29 & 30.

Accordingly, the Consortia, in consultation with MCPS senior leadership, designed and implemented the Pandemic Plan for magnet middle school admissions in the 2021–2022 school year.  ECF No. 51 ¶ 84 (citing ECF No. 27-3 ¶ 31).  The Plan operates as follows.  First, MCPS universally screens all fifth-grade students for placement in an eligibility pool.  ECF No. 27-3

---

[4] The Amended Complaint expressly incorporates by reference the sworn declaration of Jeannie Franklin, MCPS' Director of Consortia Choice and Application Program Services, who describes the Consortia's deliberative process.  *See, e.g.*, ECF No. 51 ¶ 84.  The County produced the declaration (ECF No. 27-3) and therefore obviously does not contest its authenticity or accuracy.  The Court thus accepts the declaration as part of the Amended Complaint facts and construes it most favorably to AFEF.  *See Goines*, 822 F.3d at 166.

¶ 33.  Any student who received an "A" in the relevant subjects, performed above reading grade level in fourth grade, and received a locally normed[5] minimum of 85th percentile on the MAP-Reading assessment or MAP-Math assessment is placed in the pool.  ECF No. 51 ¶¶ 86 & 87; MCPS, *Regional Middle School Magnet (Criteria-based) Admission Process: Overview & Frequently Asked Questions*, https://docs.google.com/document/d/1l0Zy-bCfG7O8E-F64VOnit_54fjOIU_lTR1JyU8SSMg/edit (last visited July 24, 2022) (the "March 2021 FAQ").[6] MCPS next employs a lottery to choose from the pool the students to be admitted to the program, in order of lottery number until each magnet class reaches capacity.  March 2021 FAQ at 1.  The remaining students in the pool receive special enrichment programming at their local schools. *Id.*

### E.  The Pandemic Plan Replaces the Field Test Indefinitely

On September 30, 2021, MCPS announced it would implement the Pandemic Plan for the foreseeable future.  *See* ECF Nos. 41 & 41-1.  Also as of this time, MCPS leadership had changed almost completely.  Dr. Smith, the superintendent responsible for overseeing the Metis Report and Field Test, retired and Dr. Monifa McKnight took his place.  *See* ECF No. 51 ¶ 15; *see also* Caitlynn Peetz, *McKnight Named Next MCPS Superintendent*, Bethesda Mag. (Feb. 8, 2022), https://bethesdamagazine.com/bethesda-beat/schools/mcknight-named-next-mcps-superintendent/.  Likewise, the composition of the Board had changed substantially, as only three of the eight members who had participated in the Field Test controversy remained in office.  *See*

---

[5] As for locally norming the MAP scores, MCPS explains that it applies the same concept of norming used by the Maryland State Department of Education, but it does not explain precisely how local norming is implemented.  ECF No. 51 ¶ 87 ("MCPS' explanation of the 2021 admissions process did not explain how MAP percentiles were locally normed.").

[6] The March 2021 FAQ was prepared by MCPS and shared publicly.  The Amended Complaint incorporates by reference the March 2021 FAQ (ECF No. 51 at 33 n.50), and so it is accepted as part of the Amended Complaint and construed most favorably to AFEF.  *See Goines*, 822 F.3d at 166.

MCPS, Board of Education: Meet the Members, *Citizens Elected to the Montgomery County Board of Education*,

https://www.montgomeryschoolsmd.org/uploadedFiles/boe/members/ElectedBoardMembers.pdf

(last visited July 13, 2022); *see also* ECF No. 87-1 at 15 ("[W]ith one exception, all members of

the Board of Education *identified in the Amended Complaint* no longer serve on the Board.")

(emphasis added).

### F.  The Renewed Motion to Dismiss

After MCPS announced that it would implement the Pandemic Plan indefinitely, the

Court granted AFEF leave to amend the Complaint.  ECF No. 48.  AFEF, in turn, abandoned its

challenge of the Field Test and now alleges solely that the Pandemic Plan intentionally

discriminates against Asian American students, in violation of the Equal Protection Clause of the

Fourteenth Amendment.  *See generally* ECF Nos. 51 & 95.

MCPS, in response, renewed its challenges to the sufficiency of AFEF's claim on nearly

identical grounds as before.  *See* ECF No. 87.  MCPS is joined by a coalition of five nonprofit

organizations—the Montgomery County Branch of the NAACP, Montgomery County

Progressive Asian American Network, Asian American Youth Leadership Empowerment and

Development, and CASA Inc.—which seek to intervene as defendants in the action.  ECF Nos.

55, 69, 88, 97.  The Court held that request in abeyance, but it allowed the coalition to be heard

as *Amici Curiae* ("*Amici*") on the motion to dismiss.  ECF No. 84.  For the reasons discussed

below, the Court agrees with MCPS and *Amici* that AFEF's equal protection challenge to the

Pandemic Plan fails as a matter of law.

## II.      Standard of Review

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). The Court accepts "the well-pled allegations of the complaint as true," and construes all facts and reasonable inferences most favorably to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). To survive a motion to dismiss, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). When ruling on a motion to dismiss, the Court may consider materials attached to the complaint, or incorporated by reference, without transforming the motion into one for summary judgment. *See* Fed. R. Civ. P. 10(c); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Court may also take judicial notice of facts which are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Kayle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011).

## III.     Analysis

The Equal Protection Clause of the Fourteenth Amendment prohibits states from denying "to any person within its jurisdiction the equal protection of the laws.'" *Fisher v. King*, 232 F.3d 391, 399 (4th Cir. 2000) (quoting U.S. Const. amend. XIV, § 1). The clause prohibits a government entity from "purposefully discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)). Intentional discrimination occurs when: "(1) a law or policy explicitly classifies citizens on the basis of race; (2) a facially neutral law or policy is applied differently on the basis of race; or (3)

a facially neutral law or policy that is applied evenhandedly is motivated by discriminatory intent and has a racially discriminatory impact." *Doe ex rel. Doe*, 665 F.3d 524, 543 (3d Cir. 2011) (citations omitted); *see also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016); *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 819 (4th Cir. 1995).

If the challenged law or policy falls under one of these categories, the next inquiry centers on whether the law or policy satisfies "strict scrutiny." *See Hunt v. Cromartie*, 526 U.S. 541, 546 (1999). Strict scrutiny requires the government to demonstrate that the law or policy is "'narrowly tailored' to achieve a 'compelling' government interest." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1.*, 551 U.S. 701,720 (2007) (quoting *Adarand Contractors, Inc. v. Pena*, 515 U.S. 200, 227 (1995)). However, if the challenged conduct was not motivated by a discriminatory purpose or intent, then the Court applies rational basis review. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271–72 (1979); *see also Doe ex rel. Doe*, 665 F.3d at 544. In that circumstance, the government need only establish the conduct or policy is rationally related to a legitimate government purpose.

As before, the parties agree that the Pandemic Plan is a facially neutral admissions process that MCPS has applied evenhandedly. *See* ECF No. 95 at 7 (arguing only "that the challenged admissions criteria were 'implemented with a discriminatory *purpose*'") (emphasis added). Further, AFEF does not meaningfully contest that the Pandemic Plan is rationally related to MCPS' legitimate purposes. *See id.* at 16 n.7 (arguing only that the Pandemic Plan plausibly fails to survive strict scrutiny). Accordingly, AFEF's claim survives dismissal only if the Amended Complaint facts make plausible that the Pandemic Plan both visited a disparate impact on Asian American students and was motivated by discriminatory intent such that strict

scrutiny applies.  *See Vill. of Arlington Heights v. Metro. Hous. Develop. Corp.*, 429 U.S. 252, 264–65 (1977) (citing *Washington*, 426 U.S. at 229).

### A.  Disparate Impact

Although the parties are silent on the question of disparate impact, *Amici* persuasively argue that this Court should revisit the issue with the "benefit of adversarial briefing."  *See* ECF No. 88 at 10; *see also* ECF Nos. 21-1; 22; 24; 34.  *Amici* are correct that in *AFEF I*, the Court simply accepted AFEF's disparate impact analysis, in large part because MCPS had not advanced any real opposition to it.  *See AFEF I*, 560 F. Supp. 3d at 952.  In particular, the Court concluded that because the Complaint plausibly averred a decline in Asian American student acceptance after the Field Test's implementation, AFEF had made plausible that the admissions changes had visited a disparate impact on this cohort.  *Id.* ("Since the Field Test was implemented, the acceptance rate for Asian American students has dropped at each of the programs.").

Amici now urge that the proper analysis does not rest on a "simple before and after comparison."  ECF No. 88 at 12–13 (citing *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 46 (1st Cir. 2021)).  *Amici* echo the concerns voiced by Judge Heytens' concurring opinion in *Coalition for TJ v. Fairfax County Public Schools*, No. 22-1280, 2022 WL 986994 (4th Cir. 2022) (unpublished), and so their arguments merit careful discussion.

As here, plaintiffs in *Coalition for TJ* raised an equal protection challenge to new admissions criteria imposed at Thomas Jefferson High School in Fairfax, Virginia.  2022 WL 986994, at *1; *see also Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, No. 21-296, 2022 WL 579809, at *1 (E.D. Va. Feb. 25, 2022).  In granting plaintiff's motion to enjoin the school from

implementing the challenged criteria, the district court employed the same before-and-after

comparison as this Court had in *AFEF I*.  *Compare AFEF I*, 560 F. Supp. 3d at 952 *with Coal.

for TJ*, 2022 WL 579809, at *6 ("The proper method for determining the 'impact of the official

action,' is a simple before-and-after comparison.") (internal citation omitted).

On appeal, the Fourth Circuit reversed, concluding that plaintiff was not likely to succeed

on the merits of its equal protection claim, in part because plaintiff could not show the

challenged admissions plan visited a disparate impact on Asian American students.  *Coal. for TJ*,

2022 WL 986994, at *1.  Judge Heytens persuasively explained that the district court's before-

and-after comparison essentially "creates a floor against which all future policies will be judged,

a principle that would, if adopted, make it exceedingly difficult for government actors to change

existing policies that have a real (albeit unintentional) disparate impact."  *Id.* at *3 (Heytens, J.,

concurring).  Instead, Judge Heytens reasoned, "the more obviously relevant comparator for

determining whether this race neutral admissions policy has an outsized impact on a particular

racial group is the percentage of applicants versus the percentage of offers," because that "metric

targets more directly the core question for assessing disparate impact: whether members of one

group have, proportionally, more difficulty securing admission than others."  *Id.*

AFEF offers no meaningful response to this point.  It first urges the Court essentially to

stick with its previous analysis even if erroneous.  ECF No. 95 at 14 n.6 ("Amici dispute the

existence of an adverse impact on Asian Americans . . . . But this Court has already rejected

Amici's suggestion that the proper comparator is a group's overall representation in the MCPS

student body.").   AFEF relatedly maintains that to depart from the before-and-after comparison

would permit a school to "engage in racial balancing without having to justify its action under

strict scrutiny."  *Id.*  But this argument puts the cart before the horse.  Strict scrutiny is triggered

only if AFEF avers sufficient facts to make plausible that the change in the admission process adversely affected Asian American students such that the inference of intentional racial balancing is permitted.

In short, AFEF gives this Court no reason to doubt the soundness of Judge Heytens' analysis.  What is more, the demographic data incorporated into the Amended Complaint makes his point.  Under the Field Test or Pandemic Plan, Asian American students consistently have occupied a proportionally greater share of students admitted into the magnet program as compared to their representation in the applicant pool.[7]

**Asian American Student Representation in Middle School Magnet Programs**

| | % Asian American Applicants Field Test 2019–2020 | % Asian American Admittees Field Test 2019–2020 | % Asian American Applicants Expanded Field Test 2020–2021 | % Asian American Admittees Expanded Field Test 2020–2021 | % Asian American Applicants Pandemic Plan 2021–2022 | % Asian American Admittees Pandemic Plan 2021–2022 |
|---|---|---|---|---|---|---|
| Clemente | 24.4% | 57.1% | 21.9% | 44.4% | 16.5% | 29.3% |
| MLK | 24.3% | 38.8% | 21.9% | 24.3% | 16.5% | 32.0% |
| Takoma Park | 19.2% | 28.0% | 16.1% | 35.4% | 13.2% | 20.8% |
| Eastern | 19.1% | 22.4% | 16.1% | 23.9% | 13.2% | 22.3% |

ECF No. 1-4 at 9–12; ECF No. 33-1 at 20–23.

Accepting these facts as true and most favorably to AFEF, the Court cannot see how the Pandemic Plan visited a disproportionate *burden* on Asian American students when the percentage of admitted Asian American students so substantially outpaces the percentage representation among all applicants.  Because the Amended Complaint does not aver plausibly

---

[7] Because both the Field Test and Pandemic Plan screen all fifth-grade students for eligibility, the demographics of the applicant pool and the fifth-grade student population are the same.  *See* ECF No. 51 ¶ 49 (explaining that MCPS now uses "universal screening" of all fifth-grade students).

that the Pandemic Plan disparately impacts Asian American students, the claim fails on this basis alone.

### B. Discriminatory Intent

Alternatively, even if the Court concluded otherwise, no facts give rise to the inference that the Pandemic Plan was implemented with discriminatory intent.  As before, the Court must conduct a "sensitive inquiry" into the "circumstantial and direct evidence of intent." *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (quoting *Arlington Heights*, 429 U.S. at 266).  In this regard, AFEF need not aver "that the challenged action rested solely on racially discriminatory purposes . . . or even that a particular purpose was the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265.  However, the complaint facts still must give rise to the inference that the Pandemic Plan was enacted "'because of,' and not 'in spite of,' its discriminatory effect. *McCrory*, 831 F.3d at 220 (citing *Feeney*, 442 U.S. at 279).

Five non-exhaustive factors, first articulated in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, guide this analysis: (1) the historical background of the Pandemic Plan, (2) the specific sequence of events leading to the Plan, (3) the Plan's "legislative history," (4) whether MCPS departed or varied from its normal procedures in enacting the Plan, and (5) whether the Plan "bears more heavily on one race than another."  429 U.S. at 265–69; *see also N. Carolina State Conf. of NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020); *Bos. Parent*, 996 F.3d at 45 (citing *Anderson ex rel. Dowd v. City of Bos.*, 375 F.3d 71, 83 (1st Cir. 2004)).

Turning to the events culminating in the Pandemic Plan, it is undisputed that the Pandemic Plan bears little resemblance to the Field Test.  *See* ECF No. 51 ¶ 86 ("The admissions process used during the 2021 cycle . . . *was different in many respects from the challenged field*

16

*test*.") (emphasis added).  The Pandemic Plan uses a wholly new screening and selection process

fueled by the impracticalities of the COVID-19 pandemic.  *See id.* ¶¶ 86–90; *see also* ECF No.

95 at 6.  And it was created and adopted by the Consortia under the leadership of a new

superintendent.  *See supra* Part I.D–E.

 In response, AFEF essentially recognizes the weakness of its claim.  It presses that

"discovery" is necessary to explore the "private" motivations of the Consortia.  *See* ECF No. 95

at 7–12 & nn. 2–3.  But absent any facts which make plausible that the Consortia—explicitly or

implicitly—intentionally aimed to rebalance the racial composition of the magnet programs, the

Court cannot conclude that such a motivation is *plausible* as pleaded.  *See Hughes v. LaSalle*

*Bank, N.A.*, No. 02-6384-MBMHBP, 2004 WL 414828, at *1 (S.D.N.Y. Mar. 4, 2004) ("The

purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out

whether such a claim exists.").

 Nor does the Pandemic Plan itself give rise to such an inference.  The Consortia expressly

considered that the Pandemic Plan provided for the most inclusive yet rigorous screening process

to establish a pool of eligible candidates.  Final selection, however, is now left wholly to chance.

*See* ECF No. 27-3 ¶¶ 26 & 34.  As the Consortia reasoned, admission by lottery scrubbed the

final selection of any value-based decisions, all of which could be far more vulnerable to implicit

and explicit biases.  *See id.* ¶ 26.  AFEF pleads no facts to upset the logic of this admissions plan.

Thus, when viewing the Amended Complaint most favorably to AFEF, the chain of events

leading to the Pandemic Plan are devoid of discriminatory purpose.

 Next, as to the history leading to the Pandemic Plan, the parties hotly dispute "how much

[of] the past matter[s]."  *See Raymond*, 981 F.3d at 298.  AFEF maintains, essentially, that

because this Court had previously concluded that the Complaint had plausibly stated an equal

17

protection challenge to the Field Test, then the same inferential benefit of the doubt should carry the claim here. *See* ECF No. 95 at 8. This is especially so, says AFEF, because at this stage, it need only "make it plausible" that the current plan is motivated by racial animus. *See id.* at 12.

MCPS rightly responds that the Court may not accord the Field Test history an outsized impact because "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." ECF No. 96 at 8 (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)). The challenge for this Court is to decide what weight to accord any averred discriminatory intent behind the Field Test in evaluating the Pandemic Plan.

In this respect, *Abbott v. Perez* is instructive. There, the Supreme Court of the United States was called to pass on the constitutionality of a 2013 redistricting plan enacted by the Texas legislature. *Abbott*, 138 S. Ct. at 2313. The 2013 plan was passed after the Supreme Court found an earlier redistricting plan unconstitutional and ordered the state to remedy the defects. *Id.* (citing *Perry v. Perez*, 565 U.S. 388 (2012) (per curiam)). Now reviewing the 2013 plan, the district court declared that it, too, was unconstitutional because the legislature had not demonstrated that it had adequately "purged" the "discriminatory intent" animating the earlier plan. *Id.* at 2318.

The Supreme Court squarely rejected this analysis. *Abbott*, 138 S. Ct. at 2325. Although the Court acknowledged that the "historical background" of legislation "is one evidentiary source relevant to the question of [discriminatory] intent," it explained that this factor cannot be accorded such weight that it effectively shifts the burden to the defendant to demonstrate it has "cured" its historically impermissible motives. *Id.* at 2324–25. Rather, the Supreme Court emphasized that the new legislation should be accorded the presumption of good faith, and that the plaintiff must demonstrate the 2013 Legislature "acted with invidious intent." *Id.* at 2325.

After *Abbott*, the Fourth Circuit faced a similar question in *North Carolina State Conference of the NAACP v. Raymond*. There, the plaintiffs challenged a 2018 state voter identification law passed after a previous voter identification law had been enjoined as racially discriminatory. *Raymond*, 981 F.3d at 299–300. The Fourth Circuit faulted the district court for placing great weight on the fact that a substantially identical legislative body passed the 2018 legislation without making any apparent attempt to "cleanse" the legislation of the "old" discriminatory intent. *Id.* at 304. In so doing, the Fourth Circuit cleaved closely to *Abbott*, setting forth the proper analytical framework for assessing the historic background of challenged legislation. The Court explained:

> [T]he Challengers bear the burden of showing that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law." Satisfying that burden requires looking at the four factors from the Supreme Court's *Arlington Heights* decision[.]
>
>                     \* \* \*
>
> And in doing so, the district court *must* afford the state legislature a "presumption" of good faith. *Abbott*, 138 S. Ct. at 2324. For "a finding of past discrimination" neither shifts the "allocation of the burden of proof" nor removes the "presumption of legislative good faith." *Id.*; *see also City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful."); *McCrory*, 831 F.3d at 241 (finding that we cannot "freeze North Carolina election law in place" as it existed before the 2013 Omnibus Law).

*Id.* (emphasis in original).

Accordingly, the Fourth Circuit made clear that the historical background of a challenged law is "one evidentiary source" that is certainly relevant but not dispositive. *Raymond*, 981 F.3d at 305 (quoting *Abbott*, 138 S. Ct. at 2325). Most critically, and contrary to AFEF's position, *Raymond* underscores the importance of according the challenged policy and its decisionmakers the presumption of good faith. To do otherwise would erroneously shift the burden of proof to

require the County *disprove* discriminatory intent, rather than place the onus on AFEF to aver facts from which such intent may be inferred.  *Id.* at 303–05.

Turning to this case, the Court fully embraces its prior decision regarding the magnet program's legislative history, as had the courts in *Abbott* and *Raymond.  See AFEF I*, 560 F. Supp. 3d at 954 ("[T]he Complaint allows the reasonable inference that the County wished to engage in a form of racial balancing; and that, as pleaded, makes plausible the field test was implemented with a discriminatory purpose."); *Raymond*, 981 F.3d at 305 ("None of this suggests that the 2013 General Assembly's discriminatory intent in enacting the 2013 Omnibus Law is irrelevant."); *Abbott*, 138 S. Ct. at 2325 (explaining that historical background is "relevant to the question of intent" though not dispositive).  That said, when viewing the Amended Complaint facts as true and most favorably to AFEF, the Consortia enacted a wholly new admissions process that bears little resemblance to the Field Test.  *See* ECF No. 51 ¶ 86. Further, this Court cannot ignore that, according to the Amended Complaint itself (ECF No. 51 ¶¶ 83 & 86), the Pandemic Plan came about because of COVID-19.  *Cf. Raymond*, 981 F.3d at 306 (noting the "intervening event" of constitutional amendment breaks the inferential chain linking the challenged legislation to intentional discrimination).  This intervening event alone breaks any inference that the same impetus giving rise to the Field Test also animated the Pandemic Plan.  *Id.*

Moreover, and unlike *Abbott* and *Raymond*, different decisionmakers created and implemented the Pandemic Plan.  The Consortia developed and executed the Pandemic Plan under new leadership and with many new Board members.  *See supra* Part I.E.  Where few of the decisionmakers remain the same, the Court is hard pressed to find it plausible that the same intentions fueling the Field Test can be imported to the Pandemic Plan.  Thus, even giving full

credence to the Metis Report and the former Board members' stated impetus to change the racial demographics of MCPS' magnet programs, that history alone does not make plausible that the Pandemic Plan is the product of discriminatory animus.

The Court next asks whether MCPS made "[s]ubstantive departures" from the "factors usually considered important" in decisions of this kind. *See Arlington Heights*, 429 U.S. at 267. AFEF maintains that such a departure is apparent, given that the Field Test and the Pandemic Plan were adopted and implemented in vastly different ways. Whereas the Field Test followed from highly public exchanges between the Board and the community, AFEF argues that the Pandemic Plan had been hatched in "clandestine" fashion. *See* ECF No. 95 at 10–11. AFEF's spin in this regard is not plausible.

According to the facts incorporated in the Amended Complaint, the Consortia has always been tasked with evaluating, administering, and altering admissions processes for special programs, including the magnet middle school programs. ECF No. 27-3 ¶ 20 ("Every year, a group of MCPS officials carefully collects and evaluates the data MCPS has gathered based on the prior year's magnet program selection process, identifies any changes that might be necessary . . . and recommends modifications to MCPS's senior leadership."). By contrast, nothing in the Amended Complaint supports the inference that MCPS created the Pandemic Plan (or the Consortia, for that matter) under cover of darkness. Rather, the Consortia did what it always does: create a plan, announce the plan, and implement the plan. *See generally* ECF No. 27-3.

Further, to extent there were any departures from the ordinary course of business, it must all be assessed in the context of COVID-19. The Amended Complaint makes plain that the aptly-named Pandemic Plan emerged as a solution to the obstacles presented by COVID-19.

21

*See, e.g.*, ECF No. 51 ¶ 84 (incorporating by reference the Franklin Declaration); *id.* ¶ 86 ("Due

to COVID-19 restrictions, MCPS did not administer the CogAT."); ECF No. 23 at 2 ("As you

know, the pandemic has reshaped how Montgomery County Public Schools (MCPS) delivers

services to students and families in a virtual setting, and it has impacted established annual

admission processes for the criteria-based middle school magnet programs for 2021-2022.");

March 2021 FAQ at 1 ("As part of the Pandemic Plan, the Cognitive Abilities Test (CogAT) will

not be administered this year due to limitations of in-person administration and test security.")

(emphasis omitted).  COVID-19 clearly necessitated new and innovative responses in every facet

of public education.  It thus makes little sense to attribute the COVID-19 inspired changes to the

magnet program as somehow nefarious when the entire world needed to pivot quickly, and in all

respects, to cope with the pandemic.

Lastly, the Court asks whether the Pandemic Plain "bears more heavily on one race than

another.'"  *McCrory*, 831 F.3d at 230 (quoting *Arlington Heights*, 429 U.S. at 266).  For this

factor, the Court considers whether "a clear pattern, unexplainable on grounds other than race"

has emerged from the Pandemic Plan.  *See Arlington Heights*, 429 U.S. at 266 (citing cases).

When viewing the Amended Complaint facts most favorably to AFEF, the answer is no.  Asian

American students continue to maintain strong representation in the magnet programs relative to

their composition in the applicant pool.  *See supra* Part III.A.  From this, the Court cannot view

as plausible that Asian Americans have been systematically excluded from the magnet schools

for no apparent reason.  *Cf. Gomillion v. Lightfoot*, 364 U.S. 339, 340 (1960) (finding it facially

evident that legislation was designed to exclude Black voters where all but "four or five" of the

city's Black residents were drawn out of the city limits during legislative redistricting); *Yick Wo

v. Hopkins*, 118 U.S. 356 (1886) (finding that the San Francisco Board of Supervisors held

"hostility to the race and nationality to which the petitioners belong[ed]" where all Chinese American laundry owners were denied certain permits required to operate their businesses).

AFEF likewise has not plausibly demonstrated that any particular component of the Pandemic Plan visits an outsized effect on Asian American students.  Although the Amended Complaint broadly asserts that "local norming makes it harder for Asian-American students to enter the lottery pool" (ECF No. 51 ¶ 89), no facts support this contention.  Indeed, the local norming that is part of the Plan involves the MAP-Reading and MAP-Math assessments; yet the Amended Complaint refers to a different statewide assessment—the Maryland Comprehensive Assessment Program ("MCAP") which is not even used in the magnet admissions process. *Compare* ECF No. 51 ¶ 87 *with id.* ¶ 89.

 In fairness to AFEF, the Amended Complaint contends that given 35% of Asian American students countywide achieved the "highest level" on the MCAP, yet only 24% of Asian American students were placed in the magnet programs, the disparity "suggests that local norming makes it harder for Asian American students to enter the lottery pool."  ECF No. 51 ¶ 87.  But AFEF provides no other detail as to why this attenuated explanation is plausible.  Given that the final selection for magnet admissions is wholly randomized, it is just as possible that the disparity is due to chance as it is to local norming or some other change to the admissions process.  Nor does the Amended Complaint make plausible that the MCAP phenomenon is unique to Asian American students.  Put simply, the MCAP variance by itself does not make plausible that the Pandemic Plan burdens Asian American students, let alone that it burdens Asian American students more than any other cohort.

To summarize, having considered the *Arlington Heights* factors, the Amended Complaint fails to make plausible that the Pandemic Plan was the product of intentional discrimination.

The Pandemic Plan emerged in response to COVID-19, not to address racial disparities of the magnet middle school student body.  Moreover, because the Field Test had been implemented with different aims, and under the auspices of different leadership, no facts permit this Court to import those earlier objectives to the Pandemic Plan.  And even when considering the Pandemic Plan on its own merits, nothing suggests that the process adopted by the Consortia had been designed to favor one racial group over another.  Thus, based on the foregoing, the County's motion to dismiss the Amended Complaint (ECF No. 87) must be granted.

## IV.    Conclusion

The Amended Complaint fails to make plausible that the Pandemic Plan disparately impacts Asian American students or had been implemented with discriminatory intent.  The single equal protection claim, consequently, fails as a matter of law.  The County's motion to dismiss (ECF No. 87) is GRANTED; *Amici*'s motion to intervene (ECF No. 69) is DENIED as MOOT; the Amended Complaint (ECF No. 51) is DISMISSED; and the Clerk is DIRECTED to CLOSE this case.

A separate Order follows.

July 29, 2022
Date

                                                     /s/
Paula Xinis
United States District Judge